**Quintin Phillippe JONES, Appellant,**

v.

**The STATE of Texas.**

No. 74060.

Court of Criminal Appeals of Texas,
En Banc.

Nov. 5, 2003.

David A. Pearson, IV, Fort Worth, for appellant.

Charles M. Mallin, Helena F. Faulkner, Asst. Dist. Attys., Fort Worth, Matthew Paul, State's Attorney, Austin, for state.

## OPINION

COCHRAN, J., delivered the opinion of the Court, joined by MEYERS, PRICE, HERVEY and HOLCOMB, JJ.

Appellant was convicted in February 2001 of capital murder. TEX. PENAL CODE ANN. § 19.03(a). Pursuant to the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, §§ 2(b) and 2(e), the trial judge sentenced appellant to death. Art. 37.071 § 2(g).[1] Direct appeal to this Court is automatic. Art. 37.071 § 2(h). Appellant raises sixteen points of error. We affirm.

## I. Miranda violation claim.

In his first point of error, appellant claims the trial court erred by admitting into evidence at punishment a written confession taken in connection with an extraneous offense. Appellant claims that the statement was taken in violation of *Miranda v. Arizona*[2] because he was not informed of his rights until the written statement was prepared pursuant to appellant's oral statements and appellant was about to sign it. We agree.

### A. The evidence at the guilt-innocence stage.

We begin with a summary of the evidence. The victim was appellant's eighty-three-year-old great-aunt, Berthena Bryant. Despite her income of less than $500.00 a month, Bryant occasionally made small loans to various people, including appellant, and she kept a ledger recording the loans and their repayments. On September 10, 1999, Bryant told her sister, Mattie Long, that she had refused appellant's request for a loan earlier in the day. Long testified that Bryant seemed uneasy about her conversation with appellant. The next morning, Bryant's body was discovered in her home by neighbors. A bloody, broken baseball bat was recovered at the scene. Bryant's car was located a half mile from her house and her purse and wallet were found in the car. The medical examiner, Dan Konzelman, testified to the existence of defensive bruising on Bryant's wrists and arms. Konzelman also described Bryant's various abrasions,

---

**1.** Unless otherwise indicated, this and all future references to Articles refer to the Texas Code of Criminal Procedure.

**2.** 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

bruises, and fractures, which included a broken collarbone and shoulder blade, two fractured ribs, and a fracture at the base of the skull.

Appellant was arrested for outstanding traffic warrants and for possession of a controlled substance on the same day that Bryant's body was discovered. While in custody, appellant was questioned twice about Bryant's murder by Detective Ann Gates. The first interview took place on the day he was arrested. Gates read appellant his *Miranda* warnings when she noticed that appellant had no reaction to the news of Bryant's death. Appellant gave a statement denying any involvement in Bryant's murder and claiming an alibi. The next day, after being informed of his rights again, appellant accompanied Gates to various locations in an effort to corroborate his alibi. That same day he took a polygraph examination.

When appellant's alibi information did not check out and the polygraph indicated deception, Gates interviewed appellant a second time. Gates again read appellant his *Miranda* rights, appellant agreed to waive them, and appellant gave a second written statement (the "Gates statement"). In the Gates statement appellant stated that he had "another personality" named James who lived in his head. He stated that James had started living in his head since age ten or eleven when he was molested by his brother and cousin. Appellant stated that James went to Bryant's house to steal some money. After Bryant let him in and James could not find her purse, appellant stated that James lost his temper and started hitting Bryant with a bat she kept by the door. After that, James found Bryant's purse and left in Bryant's car. Appellant stated there was $30.00 in Bryant's purse. Appellant then went to a friend's house and bought drugs with the money. He later left Bryant's car

in a parking lot. Appellant does not object to the admission of the Gates statement.

*B. The written statement concerning extraneous murders admitted at the punishment stage.*

Appellant's complaint is directed at the admission of statements he made to Texas Ranger Lane Akin nine or ten days later in which he implicated himself in two extraneous murders that were introduced at the punishment phase of his trial. Texas Ranger Richard Johnson testified at the suppression hearing that he investigated the homicides of Marc Sanders and Clark Peoples. Sanders' and Peoples' bodies were both found in the Trinity River in Wise County in the first week of June, 1999. Based on a lead from appellant's sister Keisha Jones, Johnson and Akin obtained a search warrant for appellant's residence, which was executed in the early morning hours of September 22, 1999.

Akin left during that search to meet with appellant at the Tarrant County Jail, together with a Tarrant County Sheriff's deputy, in the early hours of the morning. Akin informed appellant that he was investigating the murders of Sanders and Peoples. Appellant admitted having known the victims, but denied any involvement in their murders. Akin then asked appellant what he would say if "they" (meaning Akin and his fellow investigators) told him that they had already talked to appellant's good friend, Ricky "Red" Roosa, and that Red had told them that appellant was the "bad guy," primarily responsible for the murders. At that point, appellant orally admitted his involvement in the two murders. As appellant confessed and described details of the offense, Akin wrote down "verbatim" what appellant said on a statement form, asking questions and transcribing the answers as they went along. The entire interview lasted about an hour-and-a-

half. When appellant finished his story, Akin got up, sat down next to appellant, and went over the legal rights that appeared at the top of the written form. Then Akin and appellant read the statement together and appellant corrected mistakes, initialed revisions, and signed the statement at the bottom. Appellant's written statement (the "Akin statement") appears in the Appendix to this opinion.

*C. The failure to Mirandize appellant before interrogating him led to constitutional error in the admission of his written statement at trial.*

Appellant argues that Akin's failure to inform him of his rights at the outset of the interrogation violated his Fifth Amendment rights as protected by *Miranda* and that this violation was not harmless. The State argues that, even though appellant was not warned until after he made his oral statement, under *Oregon v. Elstad,*[3] appellant's receipt of the required warnings before signing the Akin statement rendered it voluntary and admissible.

■ In *Miranda,* the United States Supreme Court was unequivocal in holding that an accused, held in custody, must be given the required warnings "prior to questioning."[4] A failure to do so results in forfeiture of the use of any statement obtained during that interrogation by the prosecution during its case-in-chief.[5]

As the State points out, the failure to comply with *Miranda* during a custodial interrogation does not necessarily taint all subsequent confessions. In *Elstad,* the 18-year-old defendant was implicated in the burglary of a friend's family home in which $150,000 worth of art and furnishings were taken.[6] Two local officers were dispatched to the defendant's home with an arrest warrant. They found the defendant partially dressed in his room. They asked him to dress and accompany them to the living room. One of the officers asked the defendant's mother to step into the kitchen where he informed her that they had a warrant for her son's arrest for the burglary of a neighbor's home. The other officer waited with the defendant in the living room. The officer who remained with the defendant in the living room later testified:

> I sat down with Mr. Elstad and I asked him if he was aware of why Detective McAllister and myself were there to talk with him. He stated no, he had no idea why we were there. I then asked him if he knew a person by the name of Gross, and he said yes, he did, and also added that he heard that there was a robbery at the Gross house. And at that point I told Mr. Elstad that I felt he was involved in that, and he looked at me and stated, 'Yes, I was there.'[7]

After Elstad was taken to the police station and advised of his *Miranda* rights, he

**3.** 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

**4.** Throughout its opinion the *Miranda* Court emphasized the importance of giving the required warnings "at the outset" of, or "prior to," any interrogation to ensure that subsequent statements would be voluntary. *Miranda,* 384 U.S. at 445, 457, 465, 468, 474, 478, 86 S.Ct. 1602.

**5.** *Id.* at 444, 86 S.Ct. 1602. Although *Miranda* itself spoke of a broad prohibition

against the government's use of an unwarned statement, the Supreme Court later held that a non-*Mirandized,* but otherwise voluntary statement could be used to impeach a testifying defendant's credibility. *Harris v. New York,* 401 U.S. 222, 225–26, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971).

**6.** 470 U.S. at 300, 105 S.Ct. 1285.

**7.** *Id.* at 301, 105 S.Ct. 1285.

indicated he wanted to visit with the officers. He then gave a full statement describing his involvement in the burglary.[8] At trial, Elstad moved to suppress the oral statement ("I was there") and the written statement, claiming the oral statement made in response to questioning at his house "let the cat out of the bag" and tainted the later written confession as "fruit of the poisonous tree." [9]

The Supreme Court held that while Elstad's unwarned statement made at his home must be suppressed, the alleged "fruit" of a noncoercive violation might not be suppressed if it was given voluntarily.[10] A failure to give *Miranda* warnings where there has not been any actual coercion or circumstances calculated to undermine the suspect's ability to exercise his free will does not so taint the process that a later voluntary and informed waiver will not be effective.[11] The relevant inquiry is whether the later, properly warned statement was voluntarily made. "As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of" a subsequent warned statement.[12]

Examining "the surrounding circumstances and the entire course of police conduct with respect to [appellant] in evaluating the voluntariness" of appellant's written statement, we cannot place the Akin statement in the same category as the written statement at issue in *Elstad*.[13]

**8.** *Id.* at 301–302, 105 S.Ct. 1285.

**9.** *Id.* at 302, 105 S.Ct. 1285.

**10.** *Id.* at 308, 105 S.Ct. 1285.

**11.** *Id.* at 309, 105 S.Ct. 1285.

**12.** *Id.*

**13.** Both the State and the concurrence stress the number of times appellant had been warned by Officer Gates and a neutral magistrate concerning his *Miranda* rights in relation to the murder of Ms. Bryant to show that he did not need to be warned again by Ranger Akin concerning his rights in relation to the murder of Sanders and Peeples. It is true that "the mere passage of time" does not, by itself, automatically obviate prior *Miranda* warnings.

The cases cited by the concurrence are very appropriate to, and might well be dispositive of, this issue had the interrogation been by Officer Gates about Ms. Bryant's murder. *See Ex parte Bagley*, 509 S.W.2d 332, 335 (Tex.Crim.App.1974) (same A.D.A. gave multiple warnings; all questioning concerned one offense); *Gorman v. United States*, 380 F.2d 158, 164 (1st Cir.1967) (repetition of *Miranda* warnings before requesting consent to search unnecessary because we "see no reason in policy or precedent automatically to borrow a procedure adapted to one set of constitutional rights at one stage of a criminal proceeding and apply it to a quite different right, serving quite different purposes, at another stage"); *People v. Hill*, 39 Ill.2d 125, 233 N.E.2d 367, 369 (1968) (same officer, same offense; defendant made a "delayed" response to officer's initial question); *Maguire v. United States*, 396 F.2d 327, 330 (9th Cir.1968) (three days; same offense, different officer); *United States v. Springer*, 460 F.2d 1344, 1352, (7th Cir.1972) (same offense; same FBI agent; same warnings, but 1st were oral and 2nd written); *Biddy v. Diamond*, 516 F.2d 118, 122 (5th Cir.1975) (12 day lapse of time did not destroy effectiveness of original *Miranda* warnings when defendant was warned by same officers earlier, released, officers had multiple contacts with defendant at her home, and she later made a statement to her husband in front of officers at station after they reminded her of their earlier warnings); *Johnson v. State*, 56 Ala.App. 583, 324 So.2d 298, 302 (Crim.), *cert. denied*, 295 Ala. 407, 324 So.2d 305 (1975) (same officer, same offense, reminder about warnings given three days earlier); *State v. Gilreath*, 107 Ariz. 318, 487 P.2d 385, 386 (1971) (same offense, apparently same officers, no need to repeat warnings given 12 to 36 hours earlier because no "circumstances which might alert the officers that an accused may not be fully aware of his rights"); *Jackson v. State*, 268 Ind. 360, 375 N.E.2d 223, 225 (1978) (stating that de-

In *Elstad,* the unwarned oral statement was elicited almost inadvertently. The Supreme Court noted that the brief stop in the living room was not for the purpose of interrogating the suspect, but was to notify the suspect's mother of the reason for the arrest.[14] The Court also suggested that the failure to give the *Miranda* warnings may have been either the result of confusion about whether the suspect was yet in custody or a desire to avoid what would appear to be an alarming police procedure before the officers had informed the suspect's mother about his arrest.[15]

By contrast, the circumstances in the instant case reflect, at the very least, a serious misunderstanding by law enforcement, not about whether appellant was in custody, but of the dictates of *Miranda.*[16]

fendant's statement was not the result of interrogation, but "[e]ven if warnings were required, the earlier warnings were sufficient in light of the defendant's clear recognition of his right to remain silent. He conditioned his statement upon the presence of the prosecutor, showing he knew of his right to remain silent, and was waiving that right"); *State v. Russell,* 261 N.W.2d 490, 492–93 (Iowa 1978) (statements made in ambulance and three days later in hospital admissible after deputy had *Mirandized* defendant twice at arrest scene, and different officer reminded defendant of those earlier warnings and defendant stated he remembered and wished to waive them); *State v. Brown,* 601 S.W.2d 311, 314 (Mo.App.1980) (same officers, same offense, after reminder of rights given three days earlier, defendant waived rights and gave statement); *State v. Blanchey,* 75 Wash.2d 926, 454 P.2d 841, 845 (1969) (same offense, prior warnings by Canadian officials, fresh warnings by state detectives, but woven into conversation, defendant told detectives that he understood his rights and gave statement); *Koger v. State,* 117 Nev. 138, 17 P.3d 428, 431–33 (2001) (same offense, second officer knew defendant had already been warned and defendant told officer she had been warned before); *Mitchell v. State,* 982 P.2d 717, 722 (Wyo.1999) (same offense, officer reminded hospitalized defendant of warnings given by another officer several hours earlier and began to summarize them when defendant said he remembered and was willing to talk); *DeJesus v. State,* 655 A.2d 1180, 1195–96 (Del. 1995) (same officers, same offense, six-minute break in interview).

As the Fifth Circuit phrased the issue in *Biddy v. Diamond:*

The critical legal question is whether the overall activity of the police sufficiently comports with the requirements concerning the *Miranda* warnings to insulate the conduct and admissions against suppression.

516 F.2d at 122. Here, Ranger Akin was not the same officer who had originally, or at any later time, given appellant *Miranda* warnings before questioning him. Ranger Akin was questioning appellant about an entirely different offense, not the offense for which appellant had been *Mirandized.* There is no evidence that Ranger Akin ever asked appellant or anyone else if appellant had been warned by other officers, whether he remembered those warnings, and wished to waive or invoke them. Ranger Akin testified that, in his mind, a custodial "discussion interview" in not a custodial interrogation which requires *Miranda* warnings. While the mere passage of time would not necessarily dissipate the effectiveness of *Miranda* warnings, there is no factual similarity between this case and those which have held that, under the totality of the circumstances, the police conduct in question complied with the basic tenets of *Miranda.*

14. *Elstad,* 470 U.S. at 315, 105 S.Ct. 1285.

15. *Id.* at 315–16, 105 S.Ct. 1285; *see also id.* at 309, 105 S.Ct. 1285 (expressing concern for errors made by law enforcement in judging whether suspect is in custody or in administering proper *Miranda* warnings).

16. Ranger Akin testified that he did not think that he was "interrogating" appellant for purposes of *Miranda* warnings until he was ready to ask appellant to sign the written statement that appellant had orally made and which Ranger Akin had already transcribed "verbatim." Specifically, Ranger Akin testified that appellant "was Mirandized prior to the statements, him signing, before initials, reading as he is given those words, that is exactly right.... The document was not finished—wasn't finished until he initialed and signed it, yes sir. At that point, he was advised of his rights." When appellant's attorney asked if

Further, in contrast to *Elstad* where the initial unwarned statement took place at the defendant's home and the warned statement was given after transporting the defendant to the police station, the unwarned and warned statements in this case were given during a nearly undifferentiated single event, taking place in the same room as an uninterrupted and continuous process. The written Akin statement was literally a transcription of appellant's unwarned oral statements. Appellant did not make a second statement after he finally received his *Miranda* warnings; he simply signed the written statement that he had dictated to Akin before he was warned. To apply *Elstad* here and declare the Akin statement admissible by virtue of the late admonishment of the required warnings would undermine the spirit and intent of *Miranda*.[17] The waiver of rights given in connection with the Akin statement was not constitutionally valid in light of the circumstances and entire course of police conduct.

The State argues that giving appellant his *Miranda* warnings after he had verbally confessed but immediately before signing the written statement was constitutionally adequate under this Court's opinions in *Dowthitt v. State*[18] and *Allridge v. State*.[19] In *Dowthitt*, as here, the defendant objected to the admission of a statement he made in which the required warnings were not given before the interrogation but were given before the defendant signed the written statement.[20] We rejected the defendant's claim, stating that "[b]ecause a written statement is not 'obtained' (because it is not admissible) until

that was how he normally interrogates a suspect, Ranger Akin replied, "I don't think that what you are talking about is an interrogation. That's a matter of taking a statement, not an interrogation." The colloquy continued:

Q: When you sat down and started talking to [appellant], did you read his *Miranda* rights to him at that point?
A: Not at that point, no sir.
Q: Why didn't you do that at that point?
A: We just went into conversation, and then went into discussion interview about the murder, and then at the point prior to finishing this statement, he was advised of his rights from this form.
Q: I understand. Why didn't you do it prior to the time you started questioning?
A: I really didn't see the need to since we did it right here prior to completing this statement.

*Miranda*, however, indisputably requires a law enforcement agent to give the appropriate legal warnings before any questioning or "discussion interview," not merely prior to signing a written statement after all the custodial interrogation is complete. 384 U.S. at 445, 457, 465, 468, 474, 478, 86 S.Ct. 1602.

17. *See United States v. Carter*, 884 F.2d 368, 373 (8th Cir.1989) (stating that *Elstad* was inapplicable to post-*Miranda* written confes-

sion in part because "second confession came almost on the heels of the first" and custodial nature of interrogation was clear to officers); *United States v. Gonzalez–DeLeon*, 32 F.Supp.2d 925, 928–29 (W.D.Tex.1998) (holding *Elstad* inapplicable to suspect's post-*Miranda* statements where authorities interrogated suspect over an hour and elicited incriminating statements before advising suspect of rights); *State v. Seibert*, 93 S.W.3d 700, 705–707 (Mo.2002) (holding *Elstad* inapplicable where officers intentionally refrained from giving *Miranda* warnings until admission obtained and unwarned and warned portions of interview were part of one continuous process), *cert. granted*, —— U.S. ——, 123 S.Ct. 2091, 155 L.Ed.2d 1059 (2003); *Ramirez v. State*, 739 So.2d 568, 575–78 (Fla. 1999) (holding *Elstad* not applicable in part because juvenile suspect questioned at police station and gave incriminating statements before receiving warnings and when suspect finally warned, officers attempted to minimize and downplay significance of rights and used suspect's previous statements as leverage to compel him to waive rights).

18. 931 S.W.2d 244 (Tex.Crim.App.1996).

19. 762 S.W.2d 146 (Tex.Crim.App.1988).

20. *Dowthitt*, 931 S.W.2d at 258.

it is signed, giving the required warnings before the accused signs the statement *meets the statutory requirements.*[21] *Dowthitt* was based on Article 38.22 alone; this Court's discussion centered solely on the defendant's interpretation of the statute and explicitly "assum[ed] the federal constitutional requirements in *Miranda* were met."[22] *Allridge*, relied upon by the Court in *Dowthitt*, was also based solely on Article 38.22.[23] The discussion of Article 38.22 in those cases does not apply to a claim that a defendant's federal constitutional *Miranda* rights have been violated.

■ The State also argues that a defendant is not necessarily "in custody" solely because he is questioned while incarcerated. The State cites cases from several jurisdictions which have held that there must be a change in the inmate's surroundings or an added imposition on his freedom of movement before he is "in custody" for *Miranda* purposes.[24] Appellant

was incarcerated in the Tarrant County Jail under suspicion for capital murder when he was transported to another part of the jail in the early hours of the morning to meet Ranger Akin and another officer. He was taken to a small (approximately 8' × 12') interview room to meet with two officers who informed him that they were investigating the Sanders and Peoples murders. After five or ten minutes, Akin asked appellant what he would think if "they" had been told by appellant's good friend "Red" that appellant had the "primary responsibility" and was the "bad guy" in the two murders. This was a classic police "interrogation" environment. Under these circumstances, appellant was clearly in custody for purposes of *Miranda* when he gave the Akin statement.[25] Thus, the Akin statement, taken in violation of the Fifth Amendment, should not have been admitted at the punishment phase of appellant's trial.[26]

---

**21.** *Id.* (emphasis added).

**22.** *Id.* at 259. In concluding that "[t]he warnings given in the present case were both constitutionally and statutorily adequate," the *Dowthitt* Court's reference to the constitutional adequacy of the warnings pertained to the defendant's claim that the person conducting the interrogation must be the same person who gives the *Miranda* warnings. *Id.* at 258.

**23.** *Allridge*, 762 S.W.2d at 157.

**24.** *See United States v. Cooper*, 800 F.2d 412, 414 (4th Cir.1986); *Cervantes v. Walker*, 589 F.2d 424, 426–27 (9th Cir.1978).

**25.** *See Cooks v. State*, 844 S.W.2d 697, 734 (Tex.Crim.App.1992) (stating "[c]learly, while incarcerated in the Dallas County Jail, appellant was 'in custody' " for *Miranda* purposes).

**26.** *See United States v. Tejada*, 956 F.2d 1256, 1260 (2nd Cir.1992) (noting that "physical evidence seized in violation of the Fourth Amendment—unlike an involuntary confession taken in violation of the Fifth Amend-

ment—is inherently reliable"); *United States v. Schipani*, 315 F.Supp. 253, 257–58 (E.D.N.Y.1970) (discussing distinctions between Fourth and Fifth Amendments and concluding "[d]ecisions excluding the use at sentencing of confessions obtained in violation of the Fifth Amendment are not persuasive Fourth Amendment precedents"), *aff'd*, 435 F.2d 26 (2d Cir.1970); *see also Estelle v. Smith*, 451 U.S. 454, 469, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981) (holding testimony by court-ordered psychiatrist about unwarned statements made to him by defendant violated Fifth Amendment and were inadmissible at sentencing on issue of future dangerousness); *Pens v. Bail*, 902 F.2d 1464, 1466 (9th Cir. 1990) (holding unwarned confessions to extraneous crimes violated Fifth Amendment and were inadmissible at sentencing phase to enhance sentence where elicited during court-ordered psychiatric treatment while incarcerated); *but see Del Vecchio v. Illinois Dept. of Corrections*, 31 F.3d 1363 (7th Cir.1994) (stating exclusionary rule would not apply at sentencing hearing, even assuming confession taken in violation of *Miranda*, because no deterrent purpose served where confession taken fourteen years before introduced).

*D. This constitutional error was harmless beyond a reasonable doubt.*

 The final question is whether appellant was harmed by the constitutional violation.[27] Reversal is required unless we can determine, beyond a reasonable doubt, that the failure to suppress the Akin statement did not contribute to the jury's verdict at the sentencing phase.[28] If there is a reasonable likelihood that the error materially affected the jury's deliberations, the error was not harmless.[29] The reviewing court should "calculate, as nearly as possible, the probable impact of the error on the jury in light of the other evidence." [30]

 We focus upon the probable impact that admission of this statement had upon the punishment phase. Had the Akin statement concerned the capital murder offense for which appellant was charged or had it been admitted during the guilt-innocence stage, this Court would be hard-pressed indeed to find it harmless error. However, the fact that the statement was offered only during the punishment stage does affect our analysis because, at the punishment stage of a capital murder trial, the issue is not whether appellant did or did not commit the Sanders and Peoples murders. Instead, the special issues are predictive and normative: 1) would appellant probably commit future criminal acts of violence that would constitute a continuing threat to society; and 2) whether, taking into consideration all of the evidence, there are sufficient mitigating circumstances to warrant a life sentence rather than a death sentence.[31] The harmless error rule " 'promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.' " [32] Thus, we focus upon the impact that this error might have had upon the jurors' consideration of those special issues.

 In conducting this analysis in the context of a *Miranda* error, we must "judge the magnitude of the error in light of the evidence as a whole to determine the degree of prejudice to the defendant resulting from that error." [33]

27. Tex.R.App. P. 44.2(a); *see Cain v. State*, 947 S.W.2d 262, 264 (Tex.Crim.App.1997).

28. *See Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (under constitutional error analysis, reviewing court must reverse unless it is "able to declare a belief that [the error] was harmless beyond a reasonable doubt"); *Satterwhite v. Texas*, 486 U.S. 249, 258, 108 S.Ct. 1792, 100 L.Ed.2d 284 (1988) (applying *Chapman* harmless error standard to admission of unwarned statement to psychiatrist at punishment stage of defendant's capital murder trial).

29. *McCarthy v. State*, 65 S.W.3d 47, 55 (Tex. Crim.App.2001), *cert. denied*, 536 U.S. 972, 122 S.Ct. 2693, 153 L.Ed.2d 862 (2002).

30. *Id.*

31. Tex.Code Crim. Proc. art. 37.071, §§ 2(b)(1) & 2(e)(1).

32. *Satterwhite*, 486 U.S. at 256, 108 S.Ct. 1792 (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 681, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). In *Satterwhite*, the Supreme Court noted that "the evaluation of the consequences of an error in the sentencing phase of a capital case may be more difficult because of the discretion that is given to the sentencer." *Id.* at 258, 108 S.Ct. 1792. Nonetheless, we, like the Supreme Court, believe that reviewing courts "can make an intelligent judgment" about whether the erroneous admission of a statement taken in violation of *Miranda* might have affected a capital sentencing stage. *See id.*

33. *United States v. Polanco*, 93 F.3d 555, 562–63 (9th Cir.1996) (analyzing *Miranda–Elstad* error and finding it harmless because of "substantial other evidence" to prove the same fact as that contained within the defendant's improperly admitted statement). *See Milton v. Wainwright*, 407 U.S. 371, 372–73, 92 S.Ct.

Therefore, we must assess the probable weight a juror would place upon the improperly admitted statement. To do this, we assess the independent proof of appellant's participation in the extraneous murders.[34] The State established appellant's involvement in the Sanders and Peoples murders by several sources independent of the Akin statement, including the testimony of John Williams, Keisha Jones, the defense expert Dr. Finn, and the State's expert, Dr. Price.

John Williams testified that appellant had dated Williams' mother, Paula Freeman, since Williams was nine years old and that appellant had lived with them for several years. Williams testified that one day, while his mother was at work, appellant told him to go to a friend's house because appellant might "do something bad that he would have to go to jail for." Williams and his little brother went to a neighbor's house a block away. When Williams returned to his house, appellant and Ricky "Red" Roosa (who had been with appellant before Williams left) were gone but there were dark brownish spots on the carpets and walls that appeared to be blood. A criminologist for the DPS Crime Lab testified that tests confirmed the existence of human blood on the walls, carpet, and on and under the cushions in the couch at appellant's residence.

David Walker with the Wise County Sheriff's Department testified that they had few leads after several months of investigating the Peoples and Sanders murders. The first lead came when Keisha Jones, appellant's sister, told her own probation officer, after her brother's arrest, that appellant "knew something" about the murder of Peoples and Sanders. After speaking with Keisha, Walker began preparing an arrest warrant for Ricky "Red" Roosa, and Rangers Akin and Johnson obtained a search warrant for appellant's residence.

Paula Freeman testified for the defense. She stated that she and appellant had lived

2174, 33 L.Ed.2d 1 (1972) (admission of pre-*Mirandized* statement was harmless error beyond a reasonable doubt because of the overwhelming evidence of the defendant's guilt); *United States ex rel. Savory v. Lane*, 832 F.2d 1011, 1019–20 (7th Cir.1987) (concluding that admission of testimony barred by Fifth Amendment was harmless "[i]n light of the state's otherwise strong case, the relatively limited use of tainted evidence, and the lack of probative value the tainted evidence had"); *Gorham v. Franzen*, 760 F.2d 786, 796 (7th Cir.1985) (stating that "[w]here a confession, otherwise voluntary, is inadmissible for failure to comply with the strict procedural requirements of *Miranda*, reversal is not required if, on the facts in the record, the court can find beyond a reasonable doubt that its use at trial was harmless"; finding error harmless because there was other "extensive physical and testimonial evidence implicating" defendant in murder); *Harryman v. Estelle*, 616 F.2d 870, 876 (5th Cir.1980) (when determining whether admission of non-*Mirandized* statements is harmless, reviewing court must decide whether, absent that statement, the evidence remains not only sufficient to support the verdict but so overwhelming as to establish the guilt of the accused beyond a reasonable doubt; error harmless because other physical evidence was overwhelming); *Boyd v. Hawk*, 965 F.Supp. 443, 448 (S.D.N.Y. 1997) (stating that "[a] constitutional error arising from use of evidence is harmless if a jury would have reached the same guilty verdict without hearing the additional, unconstitutionally obtained evidence").

34. *See, e.g., Harrison v. Owen*, 682 F.2d 138, 141 (7th Cir.1982) (citing *Milton* and *Schneble* and stating that defendant's improperly admitted statements were harmless when other, admissible evidence, whose truth was unchallenged, proved the same facts and was "entirely consistent" with the defendant's statements); *Germany v. Estelle*, 639 F.2d 1301, 1303 (5th Cir.1981) (admission of statement obtained in violation of *Miranda* harmless error in light or other admissible evidence and fact that statement did not contradict either of defendant's defenses).

together for about three or four years. She testified that all of appellant's wrongdoing was Red's fault and that appellant was heavily influenced by Red.[35] She stated that appellant was trying to stay away from the gang and out of trouble, and that he would not have done anything if not for Red's influence. She testified that appellant was affectionate with her children, was "a really good person [who] [j]ust went the wrong way," and she asked the jury to spare his life. On cross-examination, Freeman testified that she found blood stains on the walls and the carpet of her house. She stated that when she came home and saw the stains, she called appellant who told her he had been in a fight with his friend. The next time she saw appellant, he wanted money to leave town.

Appellant's sister, Keisha Jones, was also called by the defense. On cross-examination, Keisha stated that appellant had talked to her "somewhat" about the Sanders and Peoples murders, and that she, in turn, had talked to her probation officer and Rangers Akin and Johnson about what he had said. Keisha testified that appellant told her that he was talking to Peoples in the living room when Red came from behind and hit Peoples with a barbell. Red then threatened appellant that if he did not help "finish what he started," he would hurt Freeman and her son. Keisha admitted that she had not mentioned Red's threat when she gave her statement to the police but did when she testified before the grand jury. Keisha testified that although she originally told the rangers that Sanders was forced to sit on the couch and watch while they killed Peoples, she later learned from Freeman that Sanders had remained in the car and appellant went out and got him after Peoples was killed. Keisha also testified that she was mistaken when she told the rangers that appellant told her that he and Red had committed the murders for money, jewelry, and crack. She explained that appellant and Red took these things after the murders, but that was not appellant's original intent. Finally, the State established through Keisha's cross-examination that appellant had told her that Sanders and Peoples arrived at appellant's house in a car, and that appellant and Red placed Sanders' and Peoples' bodies in a car after they were murdered.[36]

Keisha Jones' testimony of what appellant had told her about the double murder was fully admissible and mirrored, to a large extent, appellant's written statement to Akin. In both, appellant admitted his participation in the murders, yet minimized his own role. In both, appellant said Red was the main actor and the actual killer of Peoples and Sanders. In both, appellant stated that Red hit Peoples in the head with a barbell. In both, appellant stated that the victims arrived in a car which was used to transport the bodies away from appellant's residence after the murders. Keisha's testimony added: 1)

---

35. This is precisely the tenor of appellant's statement to Ranger Akin.

36. Captain David Walker with the Tarrant County Sheriff's Department testified that they located a gray Altima belonging to Peoples' girlfriend. A search of the Altima revealed the presence of human blood stains on the backseat.

Photographs of Sanders' and Peoples' remains—when their bodies were discovered at the Trinity River—were admitted into evidence. Both victims had ligatures around their necks and one also had a head wound.

Dr. Sheila Spotswood testified that she conducted Peoples' autopsy. She described Peoples' injuries in detail and stated that cause of death was homicidal violence. Peoples' autopsy photographs were admitted. Spotswood also testified about Sanders' injuries and his autopsy photos were admitted. Sanders' cause of death was also homicidal violence.

that Red made an explicit threat against appellant; 2) that she initially told police that Sanders was forced to sit on the couch and watch Peoples' murder; and 3) that she initially told police that appellant's and Red's motive for the murders was robbery. Although appellant's statement to Akin added more detail to the events surrounding the double murder, appellant's voluntary, noncustodial statements to his sister constitute an unequivocal admission of his participation in Peoples' and Sanders' deaths.

The defense also called psychologist Dr. Raymond Finn who had interviewed and evaluated appellant. Finn acknowledged appellant's participation in Sanders and Peoples murders and agreed that appellant's behavior in those murders was manipulative "to some extent."

The State called several witnesses in rebuttal, including Dr. Randall Price, a clinical and forensic psychologist, who had interviewed and evaluated appellant. Price testified about a psychopath's view of right and wrong and discussed appellant's failure to accept responsibility for his actions as one of the stronger traits of a psychopath. He pointed to appellant's blaming of his alter ego, James, for Bryant's death and his blaming of Red for Sanders' and Peoples' deaths. Price also testified that appellant did a "double denial of responsibility" when he told Price that "James wouldn't have killed his aunt if Red hadn't made him help kill Sanders and Peoples." Appellant told Price that he chose to go along with Red because of his desire to get drugs, but that it was Red's idea to kill Sanders and Peoples. Appel-

lant admitted to Price that he felt worse about killing Sanders because he and appellant were childhood friends.

In summary, the jury knew of appellant's involvement in the murders through multiple sources unrelated to the Akin statement.[37] Although the Akin statement fills in some details not included in the other evidence, appellant's participation in the murders is well established through other witnesses and evidence. Despite the fact that the statement contained some prejudicial evidence not reported by other sources,[38] the statement did not carry the weight a confession might normally bear in light of the volume and weight of the other evidence against appellant on the future dangerousness issue. Indeed, it was established at the guilt stage that appellant brutally killed his elderly aunt by beating her with a baseball bat. Evidence showed that appellant regarded Ms. Bryant as his favorite aunt and that she had treated him kindly over the years. Nonetheless, he killed her so he could steal whatever money she had in her purse to purchase drugs. In addition to the evidence introduced at the guilt or innocence phase of the trial, the State offered considerable evidence at the punishment stage. Appellant was convicted of several offenses as a juvenile, including an assault of two teachers, possession of a handgun, and an assault on another student by setting fire to her hair. One of the teachers assaulted by appellant, Mark Turner, described appellant's resistance to the teachers' efforts to restrain him: "[appellant was] just going crazy, just punching and biting and snarling ...

---

**37.** *See Milton v. Wainwright, Polanco, Savory v. Lane, Gorham v. Franzen, Harryman, Harrison v. Owen, Germany,* all *supra,* note 33.

**38.** The primary difference between Keisha's testimony and the Akin statement was Keisha's insistence that appellant went along

with the murders because Red threatened to hurt Paula Freeman and her son. Keisha's version also suggests that appellant did not plan the murders with Red beforehand but went along with Red once Red had killed Peoples.

like the Tasmanian Devil." It took five male teachers and a police officer to restrain and handcuff appellant. Appellant was not allowed to return to the school.

Substantial evidence was introduced of appellant's membership in the Hoova Crips gang. Photographs of appellant's many gang-related tattoos were admitted into evidence. A Fort Worth police officer with experience in the police department's gang unit testified at length about the gang significance of appellant's tattoos. He described nearly all of the tattoos as referring to the Five Deuces Crips gang or the Hoova Crips gang. Thus, even without the two extraneous murders, the evidence of a brutal murder, of multiple assaults, and of gang membership supports the jury's conclusion that appellant was a future danger and that mitigating circumstances did not warrant a life sentence.

We look also to the content of the erroneously admitted statement. Although appellant admitted his participation in the two extraneous murders in the Akin Statement, that statement was replete with self-serving assertions of how Ricky "Red" Roosa was the primary actor and appellant simply did what Red told him to do. When discussing the actual murders, appellant stated:

> When little Boo [Clark Peoples] walked in, Red, Ricky, hit him, little Boo, with a barbell. He hit him more than three times. Little Boo was hollering. He fell to the floor. Red told me grab him and hold him. I held little Boo down while Red choked him with his hands. Red started hitting little Boo harder and harder. Red was hyped from this shit.

> Red told me to bring a belt to tie little Boo. I took a braided leather belt out of my pants. Red tied little Boo with the belt. Red told me to help move little Boo out of sight. We moved little Boo into the back room.... Marc [Sanders] came in the house and Red hit him in the head with the barbell. Red was mad because it took Marc a long time to give up. Red kept on hitting Marc until he fell. Red took the barbell a[nd] pushed it down against Marc's neck. He told me to bring something to tie Marc up with. I brought him a white extension chord [sic]. We tied him up.

Appellant stated that after both men were dead, he helped Red put their bodies into Peoples' car and Red told appellant where to drive the car to dispose of the bodies in a river. While this statement contains some details that were not otherwise testified to by other witnesses as set out below, it contains a wealth of mitigating facts about appellant's role in the double murders. If believed, it diminishes and limits other evidence of appellant's participation in the extraneous murders. It also supports the basic defensive theory at the punishment stage that it was Red's bad influence that set appellant down the path toward his alter ego's murder of his aunt.

Under a *Chapman* analysis, we may also consider the extent to which the error was emphasized by the State.[39] In closing arguments, the State referred to the Akin statement twice. The first prosecutor addressed the voluntariness of the statement and pointed to other sources of evidence supplying the same information as that contained in the statement:

---

**39.** *See Chapman,* 386 U.S. at 25, 87 S.Ct. 824 (stating comment on defendant's failure to testify could not be deemed harmless when "prosecutor's argument and the trial judge's instruction to the jury continuously and repeatedly impressed the jury that [the jury could draw inferences of guilt] from the failure of petitioners to testify"); *United States ex rel. Savory v. Lane,* 832 F.2d at 1020 (holding *Miranda* error harmless because of state's otherwise strong case, as well as the state's relatively limited use of the tainted evidence).

The issue of voluntariness is before you again. The issue of voluntariness of the defendant's statement, and I want to address that head-on with you.... I put together here every piece of evidence that will show you how many times the defendant was specifically given Miranda warnings.... And no fewer than one, two, three, four, five, six, seven times from September 11 to September 21st did the defendant have someone go over his adult warnings with him. I imagine he was qualified, at that point, to give them to somebody else. I would imagine he knew them by heart by then.

But let's say one or two or three of you decide that you don't like the way Ranger Akin took the statement. For those of you who decide that, you know that [appellant] admitted everything to Keisha. And you have her testimony on that issue, too. So that one shouldn't hang you up at all. Whether you come down on the side that, yes, it was a knowing waiver, he had six, seven opportunities to hear those before he talked to the Ranger; or, no, it wasn't voluntary, and you want to go off on what Keisha had to say.

The second prosecutor pointed to the Akin statement as evidence refuting the notion that appellant was surprised when Red killed Peoples:

And counsel for the defense says, well, it was a surprise to this defendant that Red or Ricky Roosa, was going to kill Clark Peoples. Well, you know in his statement, and I ask you to look at his

statement, because what he says is Ricky Roosa asked me, do you know anyone with money. And that's where it begins.

Although we find this reference to the erroneously-admitted statement somewhat troubling, it was a response to the defense closing argument concerning appellant's minor role in the double murder and more of a rhetorical flourish ("And that's where it begins") than any disparagement of the defensive theory.

Further, the Akin statement by no means belittled appellant's overall mitigation case—which rested on the proposition that appellant suffered from a dissociative mental disorder manifested in a second personality called "James." Defense witnesses Keisha Jones, Paula Freeman, and Dr. Finn each testified about the presence of appellant's alter ego, James. James was made to kill appellant's aunt, but only because Red had appellant help kill Sanders and Peoples. Neither at trial nor on appeal does appellant argue that there was any dispute that he had, in fact, participated in the murder of Sanders and Peoples. We find that there were no collateral implications, detrimental to appellant's defense, that stemmed from the taking or admission of the Akin statement itself.[40]

Thus, we cannot conclude that the jury would have placed any particular weight upon the Akin statement when deliberating on the special punishment issues, given the quantity and quality of the other admissible evidence which supports their findings.[41]

---

**40.** *See Germany,* 639 F.2d at 1303 (concluding that erroneously admitted statement by defendant did not "contradict either of petitioner's defenses," thus, "when faced with the overwhelming untainted evidence ... and the peripheral impact of the incriminating statement on the strength of petitioner's asserted defenses," error harmless); *Harryman,* 616 F.2d at 877 n. 15 (noting that erroneous ad-

mission of defendant's statement "had no effect, much less an adverse effect, on the conduct of [defendant's] defense"; admission of non-Mirandized statement did not affect theory of defense).

**41.** *See Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) (any judgment as to the harmfulness of consti-

We are confident, beyond a reasonable doubt, that the erroneous admission of the Akin statement did not materially contribute to the jury's finding that there is a probability that appellant would commit criminal acts of violence that would constitute a continuing threat to society.[42] We are also confident that, had the Akin statement not been erroneously admitted into evidence, there is no reasonable likelihood that the jury might have returned an affirmative answer to the mitigation special issue.

We emphasize that a defendant's confession is generally likely to have a profound impact on a jury, especially at the guilt stage of a trial.[43] Nonetheless, given the evidence and circumstances *in this particular case,* the admission of the Akin statement during the punishment stage was harmless beyond a reasonable doubt. Point of error one is overruled.

## II. Claims concerning jurors.

### A. *Claim concerning the discharge of a juror.*

In his second point of error, appellant claims the trial court erred by refusing to grant appellant's motion for mistrial upon learning that a juror knew, and would be affected by knowing, the father of the victim of an extraneous murder presented at punishment. During the guilt or innocence phase of trial, juror David Guminski reported that he recognized Ed Sanders, who was present in the courtroom, as a former coworker. Sanders was the father of Mark Sanders, but Guminski was not aware of Sanders' connection to the case. Addressing the court in chambers, Gumin-

ski stated that he had not formed any opinions about Sanders as an audience member or a witness and did not believe he would be biased one way or the other. On the basis of this information, appellant asked the court to discharge Guminski or, alternatively, to grant a mistrial. The court asked the parties to brief the options over the weekend. Upon reconvening, appellant proposed that no evidence be offered about Sanders' son. Appellant also asked that he be allowed to question Guminski to determine possible bias. Appellant concluded by asserting that the only real remedy was a mistrial. The court denied his motion for a mistrial, but granted his request to call Guminski for additional questioning.

Guminski testified that Sanders had been his supervisor at the Colonial Country Club. He stated that they were on friendly terms at work, but did not have a social relationship, and that he had not had any contact with Sanders in the past year-and-a-half. Guminski testified that he had "a little bit of uneasiness" about knowing a potential witness and further stated that if he were to learn that Sanders had suffered some type of loss, he would probably have more empathy toward him than he would toward a stranger. Appellant renewed his motion for mistrial and, in the alternative, asserted that Guminski was "impaired." The court denied his requests, and Guminski was questioned further. Guminski explained his uneasiness as the result of worrying that he had overlooked Sanders' name on the witness list. He also testified that although he believed he could be impartial, he could not help "but think a little bit of empathy is going to leak out in

---

tutional error must be based on the reviewing court's "own reading of the record and on what seem to have been the probable impact of the [inadmissible evidence] on the minds of an average jury").

42. *See Milton v. Wainwright,* 407 U.S. at 372–73, 92 S.Ct. 2174; *Schneble v. Florida,* 405 U.S. at 429–32, 92 S.Ct. 1056.

43. *McCarthy,* 65 S.W.3d at 56.

[Sanders'] favor." Appellant re-urged his motion for mistrial as the only appropriate remedy. As an alternative, however, appellant requested that Guminski be excused. The court granted appellant's alternative request and excused Guminski. Appellant now claims on appeal that the remedy of discharge was inappropriate because bias is not a disability under Article 36.29(b).

Appellant's point of error complains of the trial court's failure to grant his motion for mistrial. Appellant does not, however, present any argument or authority in support of his claim that the mistrial should have been granted. Appellant has therefore failed to adequately brief this mistrial issue. Tex.R.App. P. 38.1(h).

■ Appellant's argument and authorities are all directed toward his contention that the trial court's discharge of Guminski was inappropriate under Article 36.29. Although appellant argued at times before the trial court that discharge under Article 36.29 would be inappropriate, he nonetheless proposed discharge as an alternative to mistrial at least three times. Because appellant requested the discharge as an alternative to mistrial, he is now estopped from complaining about it.[44] Appellant had the option of contending at trial that mistrial was the sole legal and appropriate remedy, and he could have declined to suggest or support any alternatives. By proposing alternatives he is estopped from complaining on appeal about the judge having accepted one of them.[45] Parties are often faced with difficult choices, but facing a tough dilemma does not create a claim or excuse a party for the option chosen.[46] Point of error two is overruled.

## B. Claim concerning the definition of "criminal acts of violence."

In his third point of error, appellant claims the trial court erred by instructing a prospective juror that the definition of "criminal acts of violence" includes a threat of violence. During appellant's voir dire of a prospective juror, the following exchange occurred:

> [Defense counsel]. I want to point out one other thing. We are not talking about—it says the probability is, would he commit criminal acts of violence. It does not say, with threats of violence. It doesn't say, would get in fights. It said, would commit criminal acts of violence. That means a criminal act involves violence. Common words are your use and understanding. You understand it does not say a threat of violence or was there misconduct. It has to be a criminal act of violence.
>
> [Prosecutor]. Judge, I am going to object. I think I am going to object because I think act does include speech, and certainly a threat of violence may be a criminal act under the law.

The trial court sustained the State's objection, and upon a motion by the State to instruct the juror to disregard, the court instructed the juror:

> The jury will be looking at acts of violence and inasmuch as a threat involves conduct, it could be an act of violence depending on what the jury decides.

---

**44.** Cf. Prystash v. State, 3 S.W.3d 522, 531 (Tex.Crim.App.1999) (holding that because defendant requested deletion of issue from jury charge, he was estopped from complaining about its absence on appeal).

**45.** See Benson v. State, 496 S.W.2d 68, 70 (Tex.Crim.App.1973) (stating that "[a]ppellant cannot now be heard to complain because the court granted him what he asked for").

**46.** See Ripkowski v. State, 61 S.W.3d 378, 389 (Tex.Crim.App.2001).

Appellant objected to the court's instruction, arguing that a threat was not a criminal act of violence. The court overruled appellant's objection.

■ After properly reminding the venireperson that the jury would be "looking at acts of violence," the remainder of the instruction clarified that it would be in the discretion of the jury to decide whether a threat involves conduct and, if so, whether it would then constitute an act of violence. This instruction is consistent with the language of the issue. The trial court did not err in giving the instruction. Point of error three is overruled.

C. *Claims concerning denial of writs of attachment for prospective jurors, a continuance, or a motion to quash panel.*

In his fourth point of error, appellant claims the trial court erred in denying his application for writs of attachment requiring the appearance of prospective jurors who submitted purported disqualifications on unsworn juror cards, contrary to jury selection procedures. In point of error five, appellant claims the trial court erred in denying his motion for continuance to provide time for the process of service for the sought-for writs of attachment. In point of error six, appellant claims the trial court erred in denying his motion to quash the jury panel due to the alleged noncompliance with jury selection procedures. Appellant briefs these points together.

Several members of the venire mailed in juror cards claiming disqualifications. Appellant complained about allowing mail-in exemptions and disqualifications, pointing out that some of the mail-in prospective

jurors had simply marked the disqualification they claimed on the front of the juror cards without signing the affirmation swearing to the veracity of the claimed disqualification. Appellant claimed this procedure violated statutory provisions, and he sought a writ of attachment, a continuance to allow time to summon the absent prospective jurors, and a quashing of the affected panel.

■ Article 35.01 provides a method for writ of attachment for absent jurors. It is "directory, not mandatory, and in the absence of governmental misconduct in summoning the venire, the failure to grant attachments is not reversible error unless appellant shows injury."[47] To make a showing of injury, appellant must demonstrate that he was forced to take an "objectionable juror":

> An objectionable juror, in the sense in which the term is used in this connection, means "one against whom such cause for challenge exists as would likely affect his competency or his impartiality in the trial."[48]

■ Appellant points to the place in the record where he identified two jurors who were seated but who were allegedly "objectionable." However, because appellant did not then or now point to any evidence in support of his allegation that these jurors were challengeable for cause, he has failed to meet his burden of showing he was forced to accept two challengeable jurors.[49] Points of error four, five, and six are overruled.

## III. Arrest and search issues.

In his seventh point of error, appellant claims the trial court erred by admitting

---

47. *Dowthitt,* 931 S.W.2d at 251.

48. *Stephenson v. State,* 494 S.W.2d 900, 904 (Tex.Crim.App.1973).

49. *Id.; see also Cooks v. State,* 844 S.W.2d 697, 726 (Tex.Crim.App.1992) (applying *Stephenson* test for "objectionable juror" to alleged error in jury selection procedures).

evidence seized during his arrest pursuant to an allegedly illegal arrest warrant. Appellant argues that Judge Larry Reed, who issued the *capias pro fine* traffic warrants upon which appellant's arrest was based, did not have probable cause because he lacked personal knowledge that the fines were not paid.

 Article 45.045 provides for the issuance of a *capias pro fine* for a defendant's arrest "if the defendant is not in custody when the judgment is rendered or if the defendant fails to satisfy the judgment according to its terms." While a *capias* is issued after a judgment has been rendered against the defendant, it must still be supported by probable cause.[50] But because a judgment against a defendant signifies a finding beyond a reasonable doubt that he has committed the charged offense, we have held in the context of a parole violation that a judgment coupled with a finding by the court that there is a "reason to believe" that the defendant has violated the conditions of his parole will constitute sufficient probable cause to support the issuance of a parole violation warrant.[51] While a traffic violator, unlike a parolee, is not subject to a judgment imposing a term of imprisonment, the judgment establishing the traffic violation nonetheless carries considerable weight and validity because it is based upon a finding beyond a reasonable doubt. Thus, a judgment for a traffic violation, together with a finding by the court that the defendant has failed to satisfy its terms, will comprise sufficient probable cause to support issuance of the *capias pro fine*.[52]

 Municipal Court Judge Larry Reed testified that he signed the *capias pro fine* warrants calling for appellant's arrest due to his failure to pay the fines imposed for various traffic offenses. He explained that he reviewed the file in each case. Each file contained a complaint and judgment. Each judgment stated that appellant was found guilty of the offense, set forth the amount of the fine assessed, and provided the due date. Judge Reed testified that after reviewing each judgment to verify dates and numbers, if the file contained no notation, receipt, or documentation from the clerk stating that the fine assessed had been paid, he would then determine the amount of the increased fine and issue the *capias pro fine*. Judge Reed further testified that he had been a municipal judge for over four years and had worked as a city attorney for fourteen years prior to that. Judge Reed testified that he reviews approximately 600 to 800 files a week for failure to appear or failure to satisfy the judgment in traffic offense cases and that this was the standard procedure in all such cases.

Given his years of experience in the procedures of the municipal court and his knowledge as to the reliability of the system and the operation of the clerk's office, Judge Reed made an adequate determination that there was a reason to believe the judgments had not been satisfied in appellant's cases. The trial court did not abuse its discretion in concluding that probable cause existed to issue the arrest warrant. Point of error seven is overruled.

**50.** *See Sharp v. State*, 677 S.W.2d 513, 517 (Tex.Crim.App.1984).

**51.** *Garrett v. State*, 791 S.W.2d 137, 140 (Tex.Crim.App.1990) (holding that because parolees are not afforded the same rights as persons merely suspected of committing crime, arrest is valid pursuant to parole violation warrant where issued based on "reason to believe" defendant had violated conditions of parole rather than probable cause).

**52.** *Cf. id.*

In his eighth point of error, appellant claims the trial court erred in admitting the evidence obtained as a result of the allegedly illegal search of the Hyundai in which he was a passenger immediately before his arrest. Appellant argues that the search of the Hyundai was not made pursuant to a lawful arrest or a valid need for officer safety.

■ We established in the previous point of error that appellant's arrest, under warrant, was legal. And regardless of whether the search was justified by a need for officer safety, appellant has failed to establish that he had a legitimate, reasonable expectation of privacy in the car.[53] Paula Freeman was driving the Hyundai, and appellant was hiding on the floorboard in the backseat when Officer Serra approached the car at a gas station. Appellant suggests he has standing to contest the search based on the fact that he had previously received traffic tickets while driving the Hyundai. But appellant offered no evidence that he had permission to drive the car in those instances, that he had any continued permission to drive the car, or that he had any possessory interest in it. The fact that appellant had driven the car on previous occasions does not establish that he had any continued permission to do so, had an ownership or a possessory interest in the car, or otherwise had a reasonable expectation of privacy in it.[54] Point of error eight is overruled.

In his ninth point of error, appellant claims the trial court erred in admitting evidence seized from his residence. Appellant argues that the search was illegal because it was conducted pursuant to consent from a third-party who appellant claims lacked authority to allow a search of appellant's personal effects.

■ Paula Freeman owned the house searched. Freeman testified at the suppression hearing that appellant was her boyfriend and that he had lived with her off-and-on for a couple of years. Freeman testified that, on the day after Ms. Bryant's murder, she agreed to let the officers search the house, and she knew that they were searching for appellant's clothes and shoes. Specifically, she testified that the officers were looking for clothes matching a description she herself had given them of the clothes appellant wore on the night of Ms. Bryant's murder. Freeman stated that she understood that the items would be seized if found. Freeman testified that she did appellant's laundry at her house and that she sometimes wore appellant's clothes. The officers seized some of appellant's clothing and a photograph of appellant and Red Roosa.

■ A third person may validly consent to a search when he has "equal control and equal use of the property searched." [55] Further, "common authority derives from the mutual use of the property, not the ownership or lack thereof." [56]

**53.** *Flores v. State,* 871 S.W.2d 714, 719 (Tex. Crim.App.1993) (stating when legality of search is in issue, defendant bears burden of proving that his own privacy rights were violated).

**54.** *See Hughes v. State,* 24 S.W.3d 833, 838 (Tex.Crim.App.) (holding that defendant as passenger in car did not have standing to complain of search in absence of evidence showing possessory interest or reasonable ex-

pectation of privacy); *Flores,* 871 S.W.2d at 719–20 (holding that defendant failed to establish standing in vehicle registered to his mother where there was no evidence defendant had interest in or right to use car).

**55.** *Welch v. State,* 93 S.W.3d 50, 52 (Tex. Crim.App.2002).

**56.** *Id.*

Freeman shared mutual use of her house with appellant such that she had authority to grant consent to a search of the entire house. Appellant does not dispute Freeman's authority to consent to the search of her house; instead, he claims she had no authority to consent to the seizure of his personal effects found there. But the officers did not need Freeman's consent to seize evidence of a crime found within the scope of a lawful search.[57] The trial court did not err in admitting the evidence. Point of error nine is overruled.

## IV. Challenges for cause and excusal of venirepersons.

In point of error ten, appellant claims the trial court erred by overruling a challenge for cause against a venireperson who viewed a mere threat of violence to be a criminal act of violence. In point of error twelve, appellant claims the trial court erred in denying appellant's challenge for cause against a prospective juror on the ground that the juror would define "criminal act of violence" as including a property crime with no attendant violence.

■ The phrase "criminal act of violence" has not been defined by the legislature. Therefore, jurors are presumed to attach a common meaning or understanding to the terms.[58]

Veniremember Ginny Smith testified that a criminal act of violence meant "murder or . . . a violent crime [such as] rape and stabbing." When asked by defense counsel whether a threat to kill someone would be enough or whether a "mere threat" would be sufficient to constitute a threat to society, Smith stated that it would. Appellant moved to challenge Smith on the ground that a threat did not amount to an act of violence, and that such a definition decreased the State's burden of proof. The trial court denied the challenge.

A threat might reasonably be viewed as something that could be accomplished by acts or words. For instance, a threat of violence can be made by brandishing or displaying a weapon.[59] Threats can be coercive and have a profound impact on the person to whom they are directed.[60] Thus, Smith was permitted to attach a reasonable, commonly accepted meaning to the term "criminal act of violence" and the trial court acted within its discretion in denying appellant's challenge against her.

■ Venireperson William Perkey testified during voir dire by defense counsel that, in his view, a property crime like theft is a criminal act of violence. Appellant seems to suggest that this Court should establish a bright-line rule that property offenses are not criminal acts of

---

**57.** See *Frazier v. Cupp,* 394 U.S. 731, 740, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969) (holding officers could seize personal effects of defendant which were found in a duffle bag defendant shared with third person and which were evidence of a crime when third person gave valid consent to search bag).

**58.** *Ladd v. State,* 3 S.W.3d 547, 572–73 (Tex. Crim.App.1999); *Garcia v. State,* 887 S.W.2d 846, 859 (Tex.Crim.App.1994).

**59.** *Huddleston v. State,* 661 S.W.2d 111 (Tex. Crim.App.1983) (concluding that carrying knife with 3–inch blade was sufficient to show threat of deadly force under kidnaping provi-

sion); *Michel v. State,* 834 S.W.2d 64, 67–68 (Tex.App.-Dallas 1992) (holding threat with shotgun rendered defendant criminally responsible as party for aggravated robbery).

**60.** See TEX. PEN.CODE § 1.07(a)(9) ("coercion" defined in Penal Code as "threat, however communicated"); *see also Whiteside v. State,* 115 Tex.Crim. 274, 29 S.W.2d 399, 401–403 (1930) (op. on reh'g) (recognizing homicide may be committed pursuant to threats and intimidation and gestures where they cause victim to be so terrorized that she leapt from window).

violence. Because the law does not define "criminal acts of violence," Perkey is presumed to understand the term and attach to it a common meaning.[61] Thus, the trial court did not abuse its discretion in denying appellant's challenge for cause against Perkey. Points of error ten and twelve are overruled.

▮ In appellant's eleventh point of error he contends that the trial court erred in denying his challenge for cause against a venireperson who appellant claims would automatically answer the first special issue in the affirmative unless the defendant was physically incapacitated. Venireperson Hollis Woolsey initially testified during voir dire by defense counsel that once the defendant was found guilty of capital murder, he would consider that person to be a continuing threat. Woolsey testified that he would answer the issue in the negative if the defendant was physically incapacitated in some way such as being in a wheelchair or being "60 years old and diabetic." When asked by defense counsel whether the defendant would have to be physically incapacitated, Woolsey responded "probably." However, when the State explained that he could not *automatically* answer that issue in the affirmative based only on a finding of guilt, but would have to consider all of the evidence, Woolsey agreed that he would do so.

Given Woolsey's agreement to listen to all the evidence before answering the special issue, the trial court did not abuse its discretion in denying appellant's challenge for cause.[62] Point of error eleven is overruled.

In his thirteenth point of error, appellant claims the trial court erred by granting a venireperson's excuse from service for an economic reason, outside the presence of appellant and his counsel. Summoned venireperson Sean Cerone submitted a letter to the court asking that he be excused from jury duty on January 11, 2001, and suggesting other dates that he could serve:

This letter is in response to a juror summons I received on December 21 to serve as a juror Thursday January 11, 2001. I am requesting to be excused for that date due to the fact that I am a dentist in a private practice setting and have no one available to cover my patient appointments. With that relatively short notice, I already have a full day of patients scheduled that day and cannot reschedule them without extreme difficulty and hardship to both them and myself. I would be very willing to commit to a jury summons in the near future when I can better arrange my patient scheduling responsibilities and care for my patients while I would be out. My office generally schedules approximately 8 weeks out, so may I suggest March 30, 2001, or April 6, 2001, as dates when I can properly arrange my office schedule to allow for adequate care of my patients. I appreciate your understanding in his matter. Please reply.

Article 35.03 provides that the trial court "shall then hear and determine excuses offered for not serving as a juror, and if the court deems the excuse sufficient, the court shall discharge the juror or postpone the juror's service to a date specified by the court." The statutory restriction on which appellant relies provides that a pro-

---

**61.** Venirepersons may decide for themselves what evidence would amount to a finding beyond a reasonable doubt of future dangerousness. *See Garrett v. State,* 851 S.W.2d 853, 859 (Tex.Crim.App.1993).

**62.** *Garrett,* 851 S.W.2d at 859.

spective juror may not be excused for "an economic reason" without the presence and approval of both parties.[63]

■■■■ Cerone did not ask to be excused because he needed the income from his patients on those days; rather his letter describes a scheduling problem due to the short notice. This is apparent from his suggestion of other dates on which he would be willing to serve that would allow him enough time to arrange his schedule. The postponement of jury service because of pre-existing scheduling conflicts is not the same as a person's claim that he cannot serve as a juror because he would lose income as a result of that service.[64] The trial court did not abuse its discretion in concluding that Cerone's letter was not asking to be excused for an "economic reason." [65] Point of error thirteen is overruled.

## V. Claims concerning the constitutionality of the Texas death penalty statute.

In his fourteenth point of error, appellant claims the Texas death penalty statute violates the Eighth Amendment because it allows the jury too much discretion and lacks the minimal standards and guidelines necessary to avoid an arbitrary and capri- cious imposition of the death penalty. Identical complaints have been addressed and rejected by this Court.[66] Appellant makes no new arguments concerning this claim. Point of error fourteen is overruled.

■■■ In his fifteenth point of error, appellant claims the Texas death penalty statute violates the Eighth Amendment as interpreted in *Penry v. Johnson (Penry II)*,[67] because the mitigation instruction sends "mixed signals" to jurors. Appellant argues that the statutory mitigation instruction given in his case suffers from the same constitutional flaw of sending "mixed signals" as the court-made nullification instruction submitted in *Penry II* because the statutory mitigation issue is unclear as to the burden of proof. Except for flatly asserting that the mitigation issue sends "mixed signals" because it is "unclear as to the burden of proof," appellant does not explain in what way this apparent lack of clarity constitutes a "mixed signal" like that at issue in *Penry II*. In light of our previous holdings that the mitigation issue is not unconstitutional for its failure to assign a burden of proof, appellant has not convinced us of any constitutional flaw. Point of error fifteen is overruled.

**63.** Tex. Gov't Code § 62.110(c).

**64.** *See, e.g., Ott v. State*, 627 S.W.2d 218, 225–28 (Tex.App.–Fort Worth 1981, pet.ref'd) (trial judge had discretion to excuse fourteen prospective jurors because of business scheduling conflicts; noting that "[w]hile jury service is vital and essential, .... some people called for jury service on relatively short notice, simply have insurmountable problems in serving in a particular week that must be recognized by the trial judge").

**65.** *See White v. State*, 591 S.W.2d 851, 857 (Tex.Crim.App.1979) (concluding that job-related excuses offered by five prospective jurors were not for "economic reasons" in absence of showing that jury service for these individuals would have resulted in loss of job, loss of compensation, salaries, wages, suffering of financial burden, or other economic consequences), *overruled on other grounds, Bigby v. State*, 892 S.W.2d 864 (Tex.Crim.App. 1994).

**66.** *Moore v. State*, 999 S.W.2d 385, 408 (Tex. Crim.App.1999); *Pondexter v. State*, 942 S.W.2d 577, 587 (Tex.Crim.App.1996).

**67.** 532 U.S. 782, 121 S.Ct. 1910, 150 L.Ed.2d 9 (2001). We refer to the Court's opinion as "*Penry II*" to avoid confusing it with the Court's earlier opinion in *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989).

In his sixteenth point of error, appellant claims the Texas death penalty statute violates the due process requirements of the Fourteenth Amendment by implicitly placing the burden of proof on appellant rather than requiring that a jury make a finding against appellant on that issue beyond a reasonable doubt. Appellant argues that, under *Apprendi v. New Jersey*,[68] the Texas scheme is unconstitutional for failing to require a jury finding beyond a reasonable doubt that there are no mitigation circumstances that would warrant a life sentence. Thus, appellant claims, the burden of proof would be on the State to prove beyond a reasonable doubt that the mitigating circumstances do not warrant a life sentence.

*Apprendi* is inapplicable to Article 37.071. *Apprendi* applies to fact findings that increase the penalty beyond the "prescribed statutory maximum." Under Article 37.071, the "prescribed statutory maximum" is fixed at death. There are no statutory enhancements. A jury finding on the mitigation issue does not have the potential of increasing the penalty beyond the prescribed statutory maximum, rather it has the potential for *reducing* the prescribed statutory maximum to a sentence of life imprisonment. Point of error sixteen is overruled.

The judgment of the trial court is affirmed.

KELLER, P.J., joined by KEASLER, J., filed a concurring opinion.

WOMACK, J., joined by JOHNSON, J., filed a dissenting opinion.

68. 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000).

# APPENDIX

**VOLUNTARY STATEMENT OF ACCUSED**
Officer

State of Texas X

unty of _TARRANT_ X

_09-22_ 19 _99_

I, _Quinton P. Jones_ after being duly warned by

N. _LANE AKIN & Chris RODRIGUEZ_, the person to whom this statement is made, that:

1. I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial;
2. Any statement I make may be used as evidence against me in court;
3. I have the right to have a lawyer present to advise me prior to and during any questioning;
4. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning;
5. I have the right to terminate the interview at any time.

and prior to and during the making of this statement I knowingly, intelligently, and voluntarily waive those rights set forth in this document and having knowingly, intelligently and voluntarily waived those rights I do hereby make the following free and voluntary statement:

My name is _Quinton P. Jones_, I live at _3521 Baylor Street, Fort Worth_

I am _20_ years of age. My nearest relative is _Elizabeth Hill_ whose relation to me is _Grandmother_ and who resides at _on Daniels in Fort Worth._

QS: Me and Red were heading to my house. His car broke. We walked to my house. Red asked me if I knew someone with money. We had done some business with Little Boo. I beeped Little Boo, Clark Peoples. Red said he was going to hide behind the door. I was hoping that Little Boo was by himself, but Marc Sanders was with him. Little Boo walked in by himself. Marc stayed in the car, a smoked gray Altima. When little Boo walked in, Red, Ricky, hit him, little Boo, with a barbell. He hit him more than three times. Little Boo was hollering. He fell to the floor. Red told me grab him and hold him. I held little Boo down while Red choked him with his hands. Red started hitting little Boo harder and harder. Red was hyped from this shit. Red told me to bring a belt to tie little Boo. I took a braided leather belt out of my pants. Red tied little Boo with the belt. Red told me to help move little Boo out of sight. We moved Little Boo in the back room. Little Boo was wearing some white shoes, blue Dickey pants and a sky blue shirt. Red told me to holler at Marc and have him come in. I did. Marc came in the house and Red hit him in the head with the barbell. Red was mad because it took Marc a long time to give up. Red kept on QS

Witness

_Chris Rodriguez - TCSO_
Witness

_Quinton Jones_
ACCUSED

Ra-31 (Rev. 8/85)

**VOLUNTARY STATEMENT OF ACCUSED**
Officer

State of Texas X
unty of _TARRANT_ X

09-22. 19 99

N' Quinton P. Jones _____ after being duly warned by
N. Lane Akin + Chris Rodriguez _____, the person to whom this statement is made, that:

1. I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial;
2. Any statement I make may-be used as evidence against me in court;
3. I have the right to have a lawyer present to advise me prior to and during any questioning;
4. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning;
5. I have the right to terminate the interview at any time.

and prior to and during the making of this statement I knowingly, intelligently, and voluntarily waive those rights set forth in this document and having knowingly, intelligently and voluntarily waived those rights I do hereby make the following free and voluntary statement:

My name is Quinton P. Jones _____ I live at _____
I am 20 years of age. My nearest relative is Elizabeth P. Jones _____ whose relation
to me is Grandmother and who resides at _____

hitting Marc until he fell. Red took the barbell a pushed it down against Marc's neck. He told me to bring something to tie Marc up with. I brought him a white extension chord. We tied him up. Red told me to drive around, back in little Boo's Car. And, I did. I opened the trunk. We put little Boo in the trunk. Red opened the back door and we tried to put Marc in the back seat. Marc was heavy, but we got him in there. We went in the house and cleaned up. Marc had a necklace, a Rope, gold. Marc had a ring, gold, and a pager. Clark had two or three rings. One of them was gold the other was diamond and gold. Clark had a gold and diamond cross necklace. Clark had a pager. They had two or three hundred dollars or a little bit more. They had two hundred dollars or more in Crack Cocaine. After they were loaded into the car, Red said he knew a place and he told me to drive. I drove through lake Worth and we drove to a river. They had a van there. So, I didn't know the neighborhood and so Red drove. We drove around around getting high. Then we came back and basically we pushed down a hill into the river. QPJ

Witness
Chris Rodriguez - TCSO
Witness

ACCUSED
Quinton Jones.

Ra-31 (Rev. 6/85)

**VOLUNTARY STATEMENT OF ACCUSED**
Officer

State of Texas X
inty of TARRANT X

09-22 19 99

I, Quinton P. Jones _____ after being duly warned by
N. Cane Akin + Chris Rodriquez _____, the person to whom this statement is made, that:

1. I have the right to remain silent and not make any statement at all and that any statement I make may be used against me at my trial
2. Any statement I make may be used as evidence against me in court;
3. I have the right to have a lawyer present to advise me prior to and during any questioning;
4. If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning;
5. I have the right to terminate the interview at any time.

and prior to and during the making of this statement I knowingly, intelligently, and voluntarily waive those rights set forth in this document and having knowingly, intelligently, and voluntarily waived those rights I do hereby make the following free and voluntary statement:

My name is Quinton P. Jones _____ I live at _____
I am 20 years of age. My nearest relative is Elizabeth P. Jones _____ whose relation to me is GRANDMOTHER and who resides at _____

QS I think there was a bridge close by. I walked in the water and pushed them a little farther. Then he drove to the other side were there was a trail. We dumped everything in the river, towels, clothes and the barbell. After we dumped all that in the river, he drove to a friends house. He told me to stay in the car. It was like a trailer type home in the area. He came back out and then we headed to the store and bought some cleaning stuff. It was like dusk. It was a hardware type store. We drove to some apartments in the area. We cleaned out the car. We walked to a friends house. We had waited on someone else, but they never came. So, we paid this other friend to drive us back to Fort Worth. He was kindof big and he had a white or gray van. He, Red, pawned the jewelry in Wise County or Azle or Lake Worth. QS

Chris Rodriquez - TCSO
Witness
N. Cane Akin
Witness

Quinton Jones
ACCUSED

Rs-31 (Rev. 8/85)

KELLER, P.J., filed a concurring opinion in which KEASLER, J. joined.

With regard to point of error one, I would find that there was no *Miranda*[1] violation.

**I. Warnings given before the oral interrogation were sufficient**

**A. *The issue***

Appellant was given *Miranda* warnings five different times before he made the

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

statement he now contends is inadmissible: (1) on September 11th by Detective Gates before an initial interview, (2) on September 12th by a magistrate, (3) on September 12th by Gates before appellant accompanied him to various locations to corroborate his alibi, (4) later on September 12th for a second interview by Gates, and (5) on September 19th by a magistrate. Appellant's statement to Ranger Akin, of which he now complains, was given just two days later, on September 21st. There is a threshold issue addressed only in passing by the Court: whether the passage of time caused these five sets of warnings to lose their effectiveness. If they were still effective when appellant gave his statement to Akin, then there was no *Miranda* violation. While the United States Supreme Court has never addressed this particular issue, this Court has discussed the issue once before, and this and similar issues have been addressed in numerous federal and state courts.

### B. *Texas authority*

In *Ex Parte Bagley*, the suspect was given *Miranda* warnings by arresting officers and by a magistrate.[2] Subsequent warnings were given before a polygraph exam and before the complained of statement, but it was not completely clear that these subsequent warnings were adequate.[3] Although this Court ultimately decided that the warning immediately preceding the statement was adequate, we

also found that the warnings given six to eight hours earlier would have satisfied the dictates of *Miranda*.[4] In connection with our discussion, we cited some out-of-state cases for the proposition that *Miranda* warnings "are not to be accorded unlimited efficacy or perpetuity" but were also not automatically extinguished by the mere passage of time.[5] We cited two out-of-state cases for the proposition that *Miranda* warnings may be considered effective for statements given two or three days later.[6] We also cited a previous Texas case dealing with Article 15.17[7] admonishments for the proposition that warnings may effectively cover a confession given six days later.[8]

### C. *Other jurisdictions*

As may be seen, Texas is not the only state to discuss the issue. Soon after *Miranda* was decided, the First Circuit said, in *Gorman v. United States*, that automatically requiring a suspect to be warned on multiple occasions misunderstands and trivializes the purpose for which the warnings are given:

> [W]e do not think that the *Miranda* prescription, formulated to give threshold warnings of fifth and sixth amendment rights at the earliest critical time in a criminal proceeding, must or ought to be mechanistically duplicated when circumstances indicate the advisability of requesting a second search. In the first place, advocacy of an automatic second-

2. 509 S.W.2d 332, 335 (Tex.Crim.App.1974).

3. *Id.* at 335–336.

4. *Id.* at 337.

5. *Id.* at 337 (comparing *United States v. Hopkins*, 433 F.2d 1041 (5th Cir.1970), *cert. denied*, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (1971) to *United States v. Springer*, 460 F.2d 1344 (7th Cir.), *cert. denied*, 409 U.S. 873, 93 S.Ct. 205, 34 L.Ed.2d 125 (1972)

and *Maguire v. United States*, 396 F.2d 327 (9th Cir.1968), *cert. denied*, 393 U.S. 1099, 89 S.Ct. 897, 21 L.Ed.2d 792 (1969)).

6. *Id.* (citing *Springer* and *Maguire* ).

7. Article 15.17, Texas Code of Criminal Procedure.

8. *Bagley*, 509 S.W.2d at 338 (citing *Charles v. State*, 424 S.W.2d 909 (Tex.Crim.App.1967)).

warning system misunderstands and downgrades the warnings required by *Miranda*. Their purpose was not to add a perfunctory ritual to police procedures but to be a set of procedural safeguards "to inform accused persons of their right of silence and to assure an opportunity to exercise it."[9]

The next year, the Illinois Supreme Court followed *Gorman's* lead. In *People v. Hill*, a police detective questioned a suspect multiple times during a three hour period.[10] The suspect was warned on the first occasion but those warnings were not renewed during the subsequent interviews.[11] The court held that "once *Miranda's* mandate was complied with at the threshold of the questioning it was not necessary to repeat the warnings at the beginning of each successive interview. To adopt an automatic second-warning system would be to add a perfunctory ritual to police procedures rather than providing the meaningful set of procedural safeguards envisioned by *Miranda*."[12]

To be sure, the time intervals between successive interviews in *Hill* were short, but other courts would come to apply the principle to much longer time intervals. In *Maguire v. United States*, the Ninth Circuit held that *Miranda* warnings remained effective for a statement made three days later:

Officer Hammond's warning, which was clearly adequate to meet the *Miranda* standards, came three days before the interrogation of appellant by Agent Turnage; thus, even if the warning given by Turnage was insufficient, the appellant could not claim he had not been apprised of the *Miranda* warnings.[13]

In *United States v. Springer*, the suspect was orally *Mirandized* on May 16 and given written warnings on May 18.[14] Though the Seventh Circuit believed the written warnings to be adequate, it wrote that "there is precedent to uphold the confession" even if there had been no warnings on May 18.[15]

Some courts have held that even longer periods between the warnings and the statement are permissible if the defendant is asked if he recalls the warnings. In *Biddy v. Diamond*, twelve days passed between the initial *Miranda* warnings and the statement in question.[16] Before the questioning that resulted in her statement, the suspect was asked if she remembered her rights, and she answered affirmatively.[17] In light of her affirmative response and the fact that she had previously exercised her right to counsel, the Fifth Circuit held that the earlier *Miranda* warnings remained effective.[18] In *Martin v. Wainwright*, there was a week-long interval between the *Miranda* warnings and the suspect's statement.[19] The court found that it

9. 380 F.2d 158, 164 (1st Cir.1967).

10. 39 Ill.2d 125, 233 N.E.2d 367, 369, *cert. denied*, 392 U.S. 936, 88 S.Ct. 2305, 20 L.Ed.2d 1394 (1968).

11. *Id.*

12. *Id.* at 131–132, 233 N.E.2d 367 (citing *Gorman*).

13. 396 F.2d at 331.

14. 460 F.2d at 1353.

15. *Id.*

16. 516 F.2d 118, 122 (5th Cir.1975), *cert. denied*, 425 U.S. 950, 96 S.Ct. 1724, 48 L.Ed.2d 194 (1976).

17. *Id.*

18. *Id.*

19. 770 F.2d 918, 930 (11th Cir.1985), *modified*, 781 F.2d 185 (11th Cir.1986), *cert. denied*, 479 U.S. 909, 107 S.Ct. 307, 93 L.Ed.2d 281 (1986).

was sufficient that the suspect indicated, immediately before the subsequent interview, that he still understood his rights.[20]

Similar results can be found in cases from various state courts. The Alabama Court of Criminal Appeals has found *Miranda* warnings to remain effective after an interval of three or four days, at least where the suspect affirmatively indicated that he was still aware of his rights.[21] In addressing constitutional requirements under *Escobedo v. Illinois*,[22] the Arizona Supreme Court analogized to *Miranda* cases and held that an *Escobedo* warning (right to remain silent) did not need to be repeated for interrogations that occurred twelve and thirty-six hours later.[23] In an Indiana case, the defendant had been advised of his *Miranda* rights once in October and three times in November, but in January, at the urging of his girlfriend, he told authorities he would make a statement if the prosecutor came within twenty minutes.[24] The prosecutor came, and the defendant made a statement.[25] No warnings were administered at that time.[26] The Indiana Supreme Court held that the statement was not the result of interrogation, but even if it were, the ear-lier warnings were sufficient in light of the defendant's clear recognition of his right to remain silent.[27] The Iowa Supreme Court has held that *Miranda* warnings remained effective for a statement made three days after the warnings were given, where the suspect acknowledged that he had been advised of his rights.[28] In a Missouri court of appeals case, the defendant had been advised of his *Miranda* rights on two consecutive days.[29] Two days later, the defendant made a statement to the same detectives but without further administration of *Miranda* warnings.[30] The court held that new warnings were unnecessary.[31] The Missouri Supreme Court has since cited this case for the proposition that "[t]he mere lapse of time between the receipt of *Miranda* warnings and the giving of inculpatory statements does not require the exclusion of the statements."[32] In a Washington case, the defendant was advised of his *Miranda* rights in Canada.[33] Four days later, he was interrogated in Seattle.[34] Although he was given *Miranda* warnings, these warnings were woven into the conversation.[35] The Washington Supreme Court held that it would

20. *Id.* at 930–931.

21. *Johnson v. State*, 56 Ala.App. 583, 324 So.2d 298, 302 (Crim.), *cert. denied*, 295 Ala. 407, 324 So.2d 305 (1975).

22. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964).

23. *State v. Gilreath*, 107 Ariz. 318, 487 P.2d 385, 386 (1971), *cert. denied*, 406 U.S. 921, 92 S.Ct. 1781, 32 L.Ed.2d 121 (1972).

24. *Jackson v. State*, 268 Ind. 360, 375 N.E.2d 223, 225 (1978).

25. *Id.*

26. *Id.*

27. *Id.*

28. *State v. Russell*, 261 N.W.2d 490, 492–495 (Iowa 1978).

29. *State v. Brown*, 601 S.W.2d 311, 314 (Mo. App. E.D.1980).

30. *Id.*

31. *Id.*

32. *State v. Groves*, 646 S.W.2d 82, 85 (Mo. 1983).

33. *State v. Blanchey*, 75 Wash.2d 926, 454 P.2d 841, 845 (1969), *cert. denied*, 396 U.S. 1045, 90 S.Ct. 694, 24 L.Ed.2d 688 (1970).

34. *Id.*

35. *Id.*

not decide whether the Seattle warnings were sufficient because the defendant had been admonished in Canada and his conversation indicated that he was still aware of his rights.[36]

While not confronting these longer time periods, other state courts have cited some of the above cases for the proposition that a suspect need not always be re-advised of his *Miranda* rights.[37] And while there are cases stretching all the way back to when *Miranda* was decided, there are recent cases discussing the issue as well. In 1995, the Ninth Circuit reaffirmed *Maguire's* holding that a lapse in time did not necessarily vitiate *Miranda* warnings.[38] That same year, the Delaware Supreme Court used a balancing test to uphold the admission of a confession given a short time interval after *Miranda* warnings.[39] Citing a number of earlier cases from other jurisdictions, the Supreme Court of Wyoming held in 1999: "The mere passage of time does not compromise a *Miranda* warning, and courts have generally rejected a per se rule requiring automatic re-advisement following a time delay."[40] In 2001, the Supreme Court of Nevada joined the chorus of jurisdictions holding that *Miranda* warnings are not automatically

vitiated by the passage of time.[41] In *Koger*, the warnings were given twelve days before the statement at issue.[42] The Nevada court observed that other jurisdictions have upheld statements that occurred a day, a week, or even two weeks after the administration of *Miranda* warnings.[43] Nevertheless, the court proceeded with deliberation, due to the long time interval involved.[44] After considering the totality of the circumstances, including the fact that the suspect indicated she remembered and understood her rights, the court held that the warnings did not need to be repeated.[45]

There are instances in which courts have held that *Miranda* warnings lost their effectiveness with the passage of time. In *Ex Parte J.D.H.*, the Alabama Supreme Court held that *Miranda* warnings were not effective for a confession given sixteen days later.[46] The court recognized "a line of cases" from that state's Court of Criminal Appeals "holding that once *Miranda* warnings have been given and the defendant has made a knowing, intelligent, and voluntary waiver, a failure to repeat the warnings will not automatically preclude the admission of an inculpatory state-

---

**36.** *Id.*

**37.** *Herring v. Dugger*, 528 So.2d 1176, 1178 (Fla.1988); *Watson v. State*, 227 Ga. 698, 182 S.E.2d 446, 448 (1971); *State v. Boyle*, 207 Kan. 833, 486 P.2d 849, 855–856 (1971); *State v. Peterson*, 366 A.2d 525, 528 (Me. 1976); *Moreno v. State*, 504 P.2d 1241, 1243 (Okla.Crim.App.1972); *Commonwealth v. Abrams*, 443 Pa. 295, 278 A.2d 902, 904–905 (1971); *State v. Cydzik*, 60 Wis.2d 683, 211 N.W.2d 421, 426–427 (1973).

**38.** *People of the Territory of Guam v. Pena*, 72 F.3d 767, 769–770 (9th Cir.1995); *see also United States v. Andaverde*, 64 F.3d 1305, 1313 (9th Cir.1995), *cert. denied*, 516 U.S. 1164, 116 S.Ct. 1055, 134 L.Ed.2d 199 (1996).

**39.** *DeJesus v. State*, 655 A.2d 1180, 1195–1196 (Del.1995).

**40.** *Mitchell v. State*, 982 P.2d 717, 722 (Wyo. 1999).

**41.** *Koger v. State*, 117 Nev. 138, 17 P.3d 428, 431–433 (2001).

**42.** *Id.* at 432.

**43.** *Id.* at 431–432.

**44.** *Id.* at 432.

**45.** *Id.* at 432–433.

**46.** 797 So.2d 1130, 1132 (Ala.2001).

ment."[47] The Supreme Court distinguished those cases by observing that "[i]n none of those cases did the lapse exceed a few days without at least a reminder of the warnings."[48]

In *Commonwealth v. Doe*, the suspect, on a Friday, made some comments after being given his *Miranda* warnings.[49] After being asked later that evening whether he wished to cooperate further, the suspect asked for time to think about it.[50] On Monday, a police detective returned and, without giving *Miranda* warnings, asked the suspect if he was ready to cooperate further.[51] The suspect again asked for more time to think about it, but the detective launched into a discussion of protective custody and told the suspect, "We would at least like to get the gun back."[52] In response to that statement, the suspect told the detective that they already had the gun, as it was the same one they had taken from an individual arrested for another robbery.[53] The Massachusetts Court of Appeals held that the suspect's reply should have been suppressed because the detective failed to give a new set of *Miranda* warnings.[54] The court found that the earlier warnings were ineffective due to the lapse of time and "the defendant's expression of his wish for more time before deciding whether to cooperate."[55]

In *Commonwealth v. Wideman*, the Pennsylvania Supreme Court invalidated a confession taken twelve hours after the administration of *Miranda* warnings.[56] Acknowledging earlier Pennsylvania cases holding that an accused need not always be reinformed of his *Miranda* rights, the court set forth a five-factor balancing test for determining when previously given warnings lose their effectiveness.[57] The court would consider:

(1) the time lapse between the last *Miranda* warnings and the accused's statement; (2) interruptions in the continuity of the interrogation; (3) whether there was a change of location between the place where the last *Miranda* warnings were given and the place where the accused's statement was made; (4) whether the same officer who gave the warnings also conducted the interrogation resulting in the accused's statement; and (5) whether the statement elicited during the complained of interrogation differed significantly from other statements which had been preceded by *Miranda* warnings.[58]

In holding the confession inadmissible, the court found that the time lapse of twelve hours was relatively long, that the confession occurred in the same building but in a different room (warnings administered in large homicide division office while statement given in small interrogation room), the officer securing the confession was different than the officer giving the warnings,

47. *Id.*

48. *Id.*

49. 37 Mass.App.Ct. 30, 636 N.E.2d 308, 310 (1994).

50. *Id.*

51. *Id.*

52. *Id.*

53. *Id.*

54. *Id.* at 311.

55. *Id.* Although this decision is from an intermediate appellate court, it has been cited by the Massachusetts Supreme Court with approval. *Commonwealth v. Rankins*, 429 Mass. 470, 709 N.E.2d 405, 408 (1999).

56. 460 Pa. 699, 334 A.2d 594, 596 (1975).

57. *Id.* at 598

58. *Id.*

and the later statements were materially different from earlier statements given immediately after the warnings.[59]

Finally, earlier this year, the West Virginia Supreme Court invalidated a confession taken seven days after the administration of *Miranda* warnings.[60] The defendant was given *Miranda* warnings three times on September 2, 1999, but was interrogated on September 9, 1999, without any further warnings. The court discussed cases from other jurisdictions in which there was a significant interval between the warnings and the confession—both those that upheld the confession and those that did not.[61] The court "harmonized" what it saw to be potentially contradictory cases by applying a similar, but slightly different balancing test from the one articulated in Pennsylvania:

> [T]he following totality-of-the circumstances criteria should be considered: (1) the length of the time between the giving of the first warnings and subsequent interrogation; (2) whether the warnings and the subsequent interrogation were given in the same or different places; (3) whether the warnings were given and the subsequent interrogation conducted by the same or different officers; (4) the extent to which the subsequent statement differed from any previous statements; and (5) the apparent intellectual and emotional state of the suspect.[62]

The court then decided that the lapse of seven days was a significant enough time period that it alone, "as a matter of public policy in West Virginia," was sufficient to require the re-administration of *Miranda* warnings.[63]

## D. Evaluation

As may be seen from the above discussion, numerous jurisdictions have indicated that *Miranda* warnings need not be administered immediately before the statement at issue. The Court distinguishes these cases on the basis that, in some, the second, unwarned interrogation did not involve a separate officer, while in others, the second interrogation did not involve a separate offense. While these are considerations, the point is that the various courts have used a totality of the circumstances analysis, in which these are just factors to be weighed. By treating these factors as dispositive, the Court seems to reject the totality of the circumstances analysis employed by other courts. While there are factual differences between this case and those cited, some of the facts in this case compare favorably to the others.

Some cases have upheld statements taken after a substantial time interval—in one case, as long as two weeks. The two day period in this case is significantly shorter than some cases in which the statement was found to be admissible. And although the interrogation was conducted by a different person (belonging to a different law enforcement agency), the statement was taken at the same facility at which appellant was given at least one of his earlier *Miranda* warnings. While the complained-of statement involved different events than earlier statements made immediately after *Miranda* warnings, there is no reason to believe appellant suffered from any emotional state that would have impaired his understanding of the earlier-given warnings. Moreover, appellant had

---

59. *Id.* at 599.

60. *State v. DeWeese*, 213 W.Va. 339, 582 S.E.2d 786 (2003).

61. *Id.* at 797–798.

62. *Id.* at 799.

63. *Id.*

already been warned on five different occasions and had been continuously held in custody at the Tarrant County Jail from the first time he was given those warnings. If appellant had forgotten about the earlier warnings, the magistrate's admonishments on the 19th served as a reminder. Moreover, that latest warning, given by a neutral party a significant interval after the prior interrogations were complete, should have disabused appellant of any notion that *Miranda* warnings applied only to the earlier statements.

Finally, we should consider the fact that appellant was warned, once again, before he signed his written statement. Even if these warnings were not sufficient, by themselves, to render the written confession admissible, they certainly reflect on the totality of the circumstances. If appellant was surprised by these warnings, he could have spoken up then. But he did not. He could even have refused to sign the statement despite his oral answers— such a refusal has occurred before.[64] That he signed the statement is further indication that he knew what his rights were when he chose to participate in further interrogation.

## II. Warnings given before signing of the written statement were sufficient

I would also hold that the warnings immediately preceding appellant's signing of the written statement rendered the statement admissible under *Oregon v. Elstad*.[65]

The court distinguishes the present case from *Elstad* on two bases: (1) *Elstad* involved mitigating circumstances surrounding the taking of the first statement that are not present here (the first statement was obtained "almost inadvertently," there were good motives for not giving warnings at the time, and there was some confusion over whether the suspect was in custody), and (2) the present case involves a single, continuous interrogation. Neither of these factors requires us to find a *Miranda* violation.

### A. *Law*

One problem with the first factor is the suggestion that a police officer's motive matters for the purpose of determining a *Miranda* violation. Considering subjective motivations runs contrary to the Supreme Court's use of objective tests for determining the existence of *Miranda* violations.[66] Moreover, *Elstad's* holding does not appear to depend upon the motivations of the officers involved or even on whether the *Miranda* violation was a result of objective mitigating circumstances. Rather, the decision centers on the purposes of *Miranda's* prophylactic rule.[67] The rule sweeps more broadly than the Fifth Amendment itself to provide effective protection against coercion.[68] While violation of the rule creates a presumption of compulsion for purposes of admitting the evidence in the prosecution's case in chief, such a violation does not mean that actual

---

64. *See Henderson v. State*, 962 S.W.2d 544, 549 (Tex.Crim.App.1997), *cert. denied*, 525 U.S. 978, 119 S.Ct. 437, 142 L.Ed.2d 357 (1998).

65. 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985).

66. *See Stansbury v. California*, 511 U.S. 318, 323–325, 114 S.Ct. 1526, 128 L.Ed.2d 293

(1994)(a police officer's subjective belief about custody is irrelevant to determining the applicability of *Miranda*).

67. *Elstad*, 470 U.S. at 306–307, 105 S.Ct. 1285.

68. *Id.*

compulsion has occurred.[69] As a result, the Supreme Court has been unwilling to extend this presumption of compulsion to other contexts—declining to extend it to impeachment, the discovery of physical evidence ("fruits"), or the taking of subsequent, properly warned statements.[70] "The absence of any coercion or improper tactics undercuts the twin rationales—trustworthiness and deterrence—for a broader rule. Once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement to the authorities."[71] Consequently, "[i]t is an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period."[72] As to whether *Elstad* is applicable in cases like the one in this case, Justice Brennan certainly thought so. He postulated just such a scenario as being one he was afraid *Elstad's* holding would permit:

One police practice that courts have frequently encountered involves the withholding of *Miranda* warnings until the end of an interrogation session. Specifically, the police escort a suspect into a room, sit him down and, without explaining his Fifth Amendment rights or obtaining a knowing and voluntary waiver of those rights, interrogate him about his suspected criminal activity. If the police obtain a confession, it is then typed up, the police hand the suspect a pen for his signature, and—just before he signs—the police advise him of his *Miranda* rights and ask him to proceed.[73]

If he correctly interpreted the holding in *Elstad*, then the *Miranda* warnings in this case "automatically" dissipated any taint.[74] And there is reason to believe his interpretation was correct, at least as it pertained to the necessity of a break between statements. In discussing the question, the Court said:

Of the courts that have considered whether a properly warned confession must be suppressed because it was preceded by an unwarned but clearly voluntary admission, the majority have explicitly or implicitly recognized that *Westover's* requirement of a break in the stream of events is inapposite.[75]

It might be argued that there is contrary language in *Elstad*, that could be seen as an rejecting Justice Brennan's interpretation of the Court's holding. In what might have been intended as a response to this passage, the Court says, "Justice Brennan not only distorts the reasoning and holding of our decision, but worse, invites trial courts and prosecutors to do the same."[76] But even if the statement in Justice Brennan's hypothetical is not automatically admissible, neither is it *per se* inadmissible. The Court indicated that instead, a case-by-case approach should be used, with the focus being on

69. *Id.*

70. *Id.* at 307–309, 105 S.Ct. 1285.

71. *Id.* at 308, 105 S.Ct. 1285.

72. *Id.* at 309, 105 S.Ct. 1285.

73. *Id.* at 329, 330, 105 S.Ct. 1285 (Brennan, J. dissenting).

74. *Id.* at 320, 105 S.Ct. 1285.

75. *Id.* at 310, 105 S.Ct. 1285.

76. *Id.* at 318 n. 5, 105 S.Ct. 1285 (Court's opinion).

whether the post-warning statement is voluntary:

A handful of courts have, however, applied our precedents relating to confessions obtained under coercive circumstances to situations involving wholly voluntary admissions, *requiring the passage of time or break in events before a second, fully warned statement can be deemed voluntary.* Far from establishing a rigid rule, we direct courts to avoid one; there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made. As in any such inquiry, the finder of fact must examine the surrounding circumstances and the entire course of police conduct with respect to the suspect in evaluating the voluntariness of his statements. The fact that a suspect chooses to speak after being informed of his rights is, of course, highly probative.[77]

And although the Court in our case cites cases holding *Elstad* inapplicable to a continuous interrogation, other courts have held to the contrary.[78]

## B. *Evaluation*

But regardless of whether a break between statements is necessary for *Elstad* to apply, there is one notable distinction in this case: *Miranda* warnings had been

given before—five times before the oral interrogation at issue, two of those by neutral magistrates, and the most recent being from a neutral magistrate just two days before the interrogation. Under these circumstances, the trial court could have reasonably inferred that appellant was not blindsided by the warnings given at the end of the oral interrogation. The warnings should be deemed effective for *Miranda* purposes.

## III. Conclusion

Appellant was given *Miranda* warnings—five times before the oral interrogation and once before he signed his written statement. If the purpose of *Miranda* is to ensure the voluntariness of confessions by ensuring that the accused is aware of his rights, that purpose was fulfilled in the present case.

I concur in the Court's judgment as to point of error one and join the remainder of the Court's opinion.

WOMACK, J., filed a dissenting opinion in which JOHNSON, J., joined.

With all respect to the Members of the Court who have decided otherwise, I would not conclude, beyond a reasonable doubt, that the constitutional violation in admitting the appellant's confessions to two additional murders at the punishment stage of this capital trial did not contribute to the jury's verdict for capital punishment. I would sustain the appellant's first point,

---

77. *Id.* at 318, 105 S.Ct. 1285 (emphasis added).

78. *United States v. Esquilin,* 208 F.3d 315, 319–321 (1st Cir.2000)(time lapse between interrogations relevant only if initial statement is actually coerced); *People v. Mendoza–Rodriguez,* 790 P.2d 810, 815 (Colo.1990)(continuous interrogation subject to *Elstad* analysis); *State v. Fleetwood,* 824 A.2d 1061, 1066–1070 (N.H.2003)(analyzing federal cases in applying more protective state counterpart to *Mi-*

*randa* rule; under totality of the circumstances test, no violation where suspect was given an opportunity to take a break after *Miranda* warnings were administered but she did not do so). *See also Davis v. United States,* 724 A.2d 1163, 1169–1170 (D.C.App. 1998), *cert. denied,* 528 U.S. 1082, 120 S.Ct. 805, 145 L.Ed.2d 678 (2000)(recognizing that *Elstad* did not require break between statements).

affirm the judgment of guilt, and remand this case for a new punishment hearing.