In The
*Court of Appeals*
*Ninth District of Texas at Beaumont*
NO. 09-24-00080-CR
NO. 09-24-00081-CR

**SHANE ANTHONY HARTMAN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 221st District Court**
**Montgomery County, Texas**
**Trial Cause Nos. 22-10-14743-CR and 22-10-14744-CR**

## MEMORANDUM OPINION

A grand jury indicted Appellant Shane Anthony Hartman ("Appellant," "Shane," or "Hartman") in trial cause number 22-10-14744-CR for aggravated assault with a deadly weapon. The indictment alleged Hartman assaulted his wife "Brandy"[1] on or about October 14, 2022. *See* Tex. Penal Code Ann. § 22.02(a)(2).

---

[1] We use a pseudonym to refer to the complainant and civilian witnesses not affiliated with law enforcement. *See generally* Tex. Const. art. I, § 30(a)(1) (granting

A grand jury also indicted Hartman for continuous violence against the family in trial cause number 22-10-14743-CR. The indictment for continuous violence against the family alleged violence against Brandy that occurred on or about May 5, 2022, and October 14, 2022. *See* Tex. Penal Code Ann. § 25.11(e).

The two cases were consolidated for trial. Hartman pleaded "not guilty" in both cases but a jury found him guilty as charged in the indictments. The jury assessed punishment at ten years of imprisonment for the conviction for continuous violence against the family and twenty years of imprisonment for the conviction for aggravated assault with a deadly weapon. Hartman timely filed notices of appeal. In one issue, Hartman challenges the trial court's denial of his pretrial motion to suppress certain statements he made to law enforcement, arguing that he was not advised of his *Miranda* rights. We affirm.

## Motion to Suppress

Prior to trial, Hartman's defense attorney filed a written motion to suppress the statements he made to law enforcement officers "on or about October 17-18, 2022."[2] In his motion, he argued that the statements were obtained during a custodial

---

crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process").

[2] The motion to suppress also asked the trial court to suppress certain physical evidence (a firearm, magazine, bullet casing, and "related evidence"), arguing that the evidence was obtained by a warrantless search. On appeal, Appellant does not challenge the trial court's ruling on the denial of that part of his motion to suppress.

interrogation, and Hartman was not advised of his rights under *Miranda* and under Chapter 38 of the Texas Code of Criminal Procedure. Hartman alleged that the officers questioned Hartman "for the intentional and express purpose of obtaining incriminating statements and/or a confession," that no person interrogated under such circumstances would have reasonably believed they were free to leave, the officers questioned him in his own home and he did not give them consent to enter the home, and he was handcuffed and placed in the back of a patrol car for an extended period of time.

Before trial, the trial court held a pretrial hearing on the motion to suppress. At the beginning of the pretrial hearing, the trial court stated that it understood that the State had notified the court and the defense it was not planning to offer at trial any of Hartman's statements that he made to the deputies when they were at Hartman's house, and the parties proceeded to hear testimony and hold a pretrial hearing. At the pretrial hearing, the trial court heard testimony about the investigation, the multiple calls and trips to Hartman's home, what happened when the deputies conducted a welfare check on October 21st and October 27th, and the evidence collected by the deputies when they responded on October 27th.

---

We discuss the relevant part of the motion to suppress that is necessary to address Appellant's issue on appeal. *See* Tex. R. App. P. 47.1.

3

At the pretrial motion to suppress hearing, the State called Deputy Steven Hollingsworth, with the Montgomery County Sheriff's Office, who testified that he responded to calls at Hartman's home on October 21st and October 27th of 2022. Hollingsworth testified that he went to the home on two different dates with the first being in response to requests from Crandall—who is Brandy's father—who said Brandy had shown up for work with black eyes and he asked the Sheriff to do a welfare check. On October 21st Hollingsworth made contact with Brandy at her house, and he could see a black eye, but she did not want to report anything, so he just documented his file. Later on the 27th, Crandall called again and at that time Crandall said Brandy needed help. According to Hollingsworth, when he arrived at the home on October 27th, he could hear a verbal disturbance going on inside the home, including screaming and yelling. Prior to arrival, Hollingsworth had also been told that firearms were in the home. Hollingsworth agreed the call on the 27th was an "active disturbance" and it was a call out for "family violence." He testified that Brandy answered the door on the 27th and she was crying, had visible injuries, and was distraught.

Deputy Hollingsworth's body camera video from October 27, 2022, was played during the pretrial hearing on the motion to suppress. The video depicts Brandy crying and shows Brandy opens the door and lets the Deputy into the home, the Deputy draws his pistol and tells Hartman, "come out with your hands up,

4

please[,]" and Hartman enters the room with his hands up, the Deputy then lowers his pistol, holsters the pistol, and pats Hartman down. Hartman can be heard telling the Deputy that he and Brandy had a "domestic dispute," and they were trying to work through it. After the Deputy asked Hartman about Brandy's black eyes, Hartman tells the Deputy he "pushed her around quite a bit" about a week before. The Deputy asked "how many times did you hit her? Did you kick her?" and Hartman replied, "yes" and Hartman said he "pushed her off into the wall" another time. The video depicts a hole in the wall and another part of the wall that appears to have been spackled. After speaking with Hartman, the Deputy tells Hartman he is going to detain Hartman and take him to his patrol vehicle, and the video shows the Deputy put handcuffs on Hartman at that time. Before going to the car, the Deputy follows Hartman to another room where Hartman gets his identification.

On cross-examination during the pretrial hearing, Hollingsworth agreed that when Brandy opened the door on October 27th, Brandy told him initially "nothing was going on," he "walked past" Brandy and inside to keep her from any further harm, and he was not sure where the suspect was at that point in time. Hollingsworth testified that when he entered the home, Shane Hartman, the suspect, was in the master bedroom, and Hollingsworth called out to Hartman and told him to come out with his hands up. Hollingsworth said as he entered the home, he had his duty weapon drawn based on the call notes and because he had been told that the

5

occupants were both "LTC carriers." Hartman came out of the bedroom and into the living room, and Hollingsworth did a *Terry* search of Hartman to see if he had any weapons on him. Brandy gave the officers a statement on the 27th, she told them Hartman had discharged a weapon at her previously, and she told them where Hartman kept the weapon, which was retrieved from the master bedroom, and she directed them to bullet fragments and other evidence, which they seized. At the end of the pretrial hearing, the trial court denied the motion to suppress as to the weapon, the bullet fragments, and other physical evidence.

Later during the trial, when the defense was cross-examining Hollingsworth in front of the jury, the following exchange occurred:

> Q. So, the State just asked you before you make an arrest, you look at the totality of the circumstances and all of the circumstantial evidence, then you make a determination based on the facts or circumstantial evidence as to what charge should be charged, correct?
>
> A. Yes.
>
> Q. And is that what happened in this case?
>
> A. Yes.
>
> Q. What specifically on that day - - talking about the October 27th, morning of the 28th, what specifically gave you the evidence that you made the decision that continuous family violence should be charged?
>
> A. Shane Hartman told me he actually assaulted - -

At this point, the defense attorney interrupted the witness and made a hearsay objection, and the trial court overruled the objection. The defense attorney asked to

approach the bench and at a conference at the bench, the following exchange

occurred:

> [Defense counsel]: So, we specifically addressed this yesterday about not using statements made by -- not using statements made by Mr. Hartman. It's hearsay and on the video and we talked about.
>
> THE COURT: No. 1, it's nonhearsay because it's a -- it's hearsay to him, but nonhearsay as to the State because it's admission by party opponent. Besides that, you asked the question, and he has to answer truthfully. I mean, he can answer it, and you asked him what gave him the reason to think that family violence occurred. So, that was the answer. So, I'm going to overrule your objection because you asked the question, and that opened the door for him to answer truthfully. He has to be truthful, and if that's the answer, that's the answer. I'm not going to let the State -- the State said they will approach before they get into any statements your client made, but that doesn't mean it's not out there.
>
> [Defense counsel]: Right. I would like him instructed to finish the answer without the statements. I will ask specifically without any statements by Mr. --
>
> THE COURT: It's out there. So, you are going to have to --
>
> [Defense counsel]: That's fine. He hasn't said what's said specifically. So, there's no --
>
> THE COURT: If that was the basis of probable cause, and that's the answer -- just proceed with caution. It's out there now, and the answer he said was, "Shane Hartman told me he actually assaulted --"
>
> That's what he said in front of the jury. I will let you proceed, and I don't know what else to say. I mean, you know the case. I don't know the case, but when you ask a witness a question, he has to answer truthfully.
>
> [Defense counsel]: This brings us to two motions to suppress, one, you[] ruled on regarding the admissibility of the weapon. The other one is admissibility of the statements he made and what we argue was

7

custodial interrogation, and you didn't make a ruling because the State said they weren't going to use them. So, it was a m[oo]t issue.

THE COURT: And they didn't. The State didn't put in the statement. So, I mean --

[Defense counsel]: You are saying they are not hearsay as to the State, but if not admissible period under exclusionary rules --

THE COURT: No. They are not hearsay as to the State because it's an admission by party opponent. It's under 801(e)(2). It's nonhearsay as to you. As to you, it's hearsay because the only way to get your client's statements in would be for you to put him on the stand.

[Defense counsel]: It's more than a statement because it's essentially an admission. He's saying he confessed to this or admitted whatever, which he doesn't, but it goes directly to the heart of the issue. If this is more of a confession issue, which has to be caught on the camera which means there's no waiver of Miranda rights --

THE COURT: Things that are inadmissible one way can become admissible another way. You asked the question, and he answered it. I would encourage you to move into another area. If you ask him about that statement, then he's going to answer.

[Defense counsel]: Okay. So, I'm going to reask the question and ask him not to elaborate any further on any statements that might have been made and ask if there's any independent --

THE COURT: I mean, he gets to answer the question. I mean, you just got to lead him because when you have that out there, I mean -- then, the other thing is you asked the question and it's now out there and I think that opens the State to, then, asking about it. I mean, it still has to be voluntary and still has to be -- but the thing about it is if it doesn't comport with Miranda, but your client testifies, guess what? They get to ask that question.

[Defense counsel]: He's not testifying.

8

THE COURT: I'm just saying there's another way to get it in. If you ask --

[Defense counsel]: We have no intention of that.

THE COURT: But you asked the question.

[Defense counsel]: We were discussing the handgun and statements made and everything else.

THE COURT: What's your objection?

[Defense counsel]: My objection is we had a motion in limine, and it wasn't supposed to be brought up. It was unintentional, but I think it's the appropriate to limit any further testimony to not statements to make it clear we are not going further into this. It was an inadvertent thing brought up that --

THE COURT: I'm going to have the jury step out. []
    We are outside the presence of the jury. Counsel for the State and Defense and the defendant are all present.
    The question that was asked was: "What specifically on that day -- talking about the October 27th, morning of the 28th, what specifically gave you the evidence that you made the decision that continuous family violence should be charged?"
    So, that was a pretty open-ended question, and the objection from the Defense, I believe, was that we had a motion in limine or talked about a statement, but as I said -- I want to make it clear on the record -- sometimes things that are inadmissible can become admissible, and the officer said, "Shane Hartman told me he actually assaulted --"
    Like I said on the record, you know your case. I don't know your case. I have not seen a confession or statement or written statement or anything. I haven't seen any of that. The allegation was that the State did not comport, and there was -- they did not concede, but in the pretrial hearing, they said, We are not planning on offering his statements made there. However, if he testifies or if it becomes an issue, then we will approach before we get into it. The problem, sir, is that you asked the question, and when you ask a question, the witness has to answer truthfully.

9

So, some things inadmissible can become admissible because he's taken an oath to tell the truth, and if that was part and parcel of the reason why he decided to arrest your client or why he found probable cause, then I believe he's allowed to state it. Now, it still has to be voluntary. Obviously, I'm not going to allow him to talk about some forced confession or whatever, but I don't have any evidence that's what it was. All I have evidence is that you said he was in custody and that 38.22 was not followed to the letter and the State said -- they said it was a temporary detention and they don't think 38.22 was implicated, but they conceded they were not going to bring in this statement.

So, I wanted to hash this out outside the presence of the jury so that you can make a record where it's clear of what your objection is and what your intention is because I'm not going to limit this witness. This witness has to tell the truth. So, when you have something out there that is looming --

For instance, I will use something totally different. Let's say a defendant has ten, prior felony convictions where he's been to prison ten times and you have witnesses on the stand and you, as a Defense attorney or Prosecutor, know that you have to be really, really careful when questioning the witness in guilt/innocence in front of the jury and make sure your questions are such that they are not open-ended because you never know. The witness may say, Well, yes. I don't like him or think he's a good guy because he's been to prison ten times. It's looming, and I don't know what the statement was. You are saying it wasn't really a confession, but that there were some admissions.

What exactly did -- from the State, what did the defendant say at the scene that was inculpatory?

[Prosecutor]: When officers arrived on scene, they just spoke with the defendant. We would argue the defendant wasn't even detained at this time. Officer Hollingsworth, after the conversation, let him know, [a]t this time, I'm going to need to detain you for the moment.

Is there anything I can do?

Yeah.

Can I put my boots on?

Okay.

Can I get my ID?

Sure. Let's get your ID.

He goes with the defendant into the bedroom, lets him get his stuff and puts his stuff in the pocket and tells the defendant, at this time, you are now being detained. Hold on just a little bit. I will come back.

Later, he comes out and tells him he's under arrest, but during the conversation between the defendant and Deputy Hollingsworth, when Deputy Hollingsworth walks in, the defendant comes out. He's like, What's going on man? He starts saying, Yeah. I got a little rough with her. She cheated on me. So, I pushed her up against the wall and hit her a few times. I got a little rough with her.

Within that process, he's patting him down and making sure what's going on.

How did she get these injuries tonight?

He's like, I got a little rough with her.

He's like, At this time, I'm going to have to detain you and take you outside.

Did I fairly and accurately tell the Judge what we would see if we played the body cam for her and a summation?

THE WITNESS: Yes.

THE COURT: Okay. So, the answer to your objection -- your objection is overruled. I won't ask the jury to disregard that last statement because the question you asked I believe elicited what the basis of his probable cause was, and it was pretty broad. You say "specifically," but what specifically gave you the evidence that you made the decision continuous family violence should be charged. So, if that was part of it, what his statement was, then that gets to come in because he's being truthful under oath. So, I'm going to have you just go on. I'm not going to highlight it to the jury or whatever.

[Defense counsel]: I would like to go on the record, if I may, just to create this record and make an offer of proof that I think is very relevant here. I'm not entirely convinced he was truthful. In the first body cam video, it's approximately 15 minutes long. It begins when he's on scene and goes until the time he puts Mr. Hartman in the car and a minute or so after that. So, at that point, he's absolutely detained. He tells him, I'm detaining you. They go to the bedroom, all that the State just discussed. He goes to the car. That's where the first video ends. It's 15 minutes and 40-something seconds.

11

In that video, the first video, the DA has already been contacted and said that he's going to take charges for continuous. They have already made the decision that they are going to charge him with continuous, and he asks one final time -- after he's detained, after he's in custody, after the DA accepted the charges, so, there's no question he's going to jail -- I'm going to ask you one more time. How many times in the last 12 months because Mr. Hartman, at no point, even if the statements were in, said anything about anything other than October 14th, nothing about the 17th, as the state alleged, nothing about Mother's Day or Cinco de Mayo or whatever with her forehead, only that one thing. He denies repeatedly it's ever happened before. The only person that thinks it, at that point, is Deputy Hollingsworth, but it's not because of anything that my client said.

Again, I would argue because of the use of force, because of the way that he was approached and entered the house, those circumstances, the number of officers present, the fact that the father-in-law was present, all those circumstances put under the test would make, even if he wasn't handcuffed initially, a custodial interrogation. This was not an assault that happened night. It was an assault that allegedly took place two weeks ago that had been investigated, not just by law enforcement, but by Deputy Hollingsworth, specifically, a week prior. So, there's no imminent danger. There's not an emergency. There's no exception whatsoever that applies to the search warrant.

THE COURT: Hold on. Hold on. During the hearing, when he walked up, he heard an altercation going on, and he heard a fighting going on.

[Defense counsel]: Sure, and I would say, for the sake of argument, at that time, he may have believed there was an emergency, but before he ever began asking questions, that was already dispelled. Ms. Hartman has already been separated. He's off --

THE COURT: So, you are saying he doesn't even have the right to ask a question? A lot of times if you are not arrested right there, you can get a warrant for a previous thing. So, an officer has the right to walk up to a house, knock on the door, ask if everything is okay and ask questions. When you have one party that's talking to you and says, Come on in, and is writing a statement and those types of things -- there's a lot going on here. I don't have anything before me that his statements were involuntary or that he was threatened in any way. I

12

didn't see anything in the testimony in our pretrial hearing prior to even picking -- starting the trial that indicated to me that the words were coerced or that he was threatened in any way. So, I understand what you are saying -- that you are saying -- you are asserting it does not comport with 38.22, but the State didn't offer it. You asked the question, sir, and the question was pretty open about why he made the decision to arrest him for continuous.

[Defense counsel]: Correct, and continuous would require two or more acts in a 12-month period. That's why I believe Deputy --

THE COURT: Hold on. Didn't he go over there a week before? So, didn't he see her with apparent injuries a week before --

[Defense counsel]: Uh-huh.

THE COURT: -- and sees her this night, and there's an altercation of some sort?

[Defense counsel]: No physical altercation. That's never alleged.

THE COURT: His answer didn't mention the Mother's Day event. It mentioned these two -- she was writing her statement is my understanding at this time. I don't know --

[Defense counsel]: No. She hasn't admitted anything at this point. She's crying and upset, not because of anything that's happened physically, but because she feels like she's getting kicked out. She repeatedly says that. He's kicking me out. He wants her to leave, but there's no evidence or allegations that anything physical took place on the night of the arrest.

THE COURT: She shows them the alleged bullet holes in the house. I'm not going to argue with you. My ruling is you asked a question. He answered it. He has to be truthful, and I'm going to ask you to be cautious on what you ask him.
        Yes?

[Prosecutor]: Judge, the State disagrees with the depiction that the Defense attorney represented in this body cam. We would like to the

13

present this body cam for appellate purposes later because we disagree how that chain of events happened, and also, when the deputy was answering his question, he was stopped mid sentence. So, he didn't talk about all the reasons why, as well. The State is still not intending -- because we would rather play on the safe side -- of admitting the defendant's statement or going further into what those statements were, but we do agree with the Judge's ruling that the answer was open. He has to answer the question truthfully, but the State is not going to, now, at this time, enter in all of the defendant's statements.

THE COURT: So, I took copious notes when you were playing that body cam video because it kind of is very fact-specific on whether or not I believe he was temporarily detained, which even if you are in handcuffs, that has been held to not be arrested. There are numerous the cases. If there was a bright-line rule, it would be helpful, but there is not, as we know

So, in this case, it turns on a dime. So, I took copious notes, and what I saw is when he got there, he heard what appeared to be an argument going on that appeared to be escalating. Based on what he knew and the notes and that he might have a gun -- I mean, I think there was enough there, reasonable suspicion, for sure. You know, as an officer goes in the scene, he doesn't know who to believe. He doesn't know what's going to happen, and I think there's clear case law that you can temporarily detain someone for officer safety while you get the lay of the land and investigate what's going on.

I understand what you are saying, sir, but this was an ongoing investigation, and when you are crossing someone, you ask them a question, sometimes the answer is not what you want. In this case, I can't berate the officer or sustain your objection based on what your question was. So, I'm going to urge both sides to be cautious, and it kind of opened the door. . .
. . .
-- and the officer has the duty at the scene to get the facts, to layout what's going on. Sometimes, it's a DWI, and sometime, it's just a PI. Sometimes, they can't wheel the defendant. It turns on a dime on the facts, and when he's at the scene, all he knows is he went there a week before and she looked like she had been hurt and he's there that night and it's obvious there's some kind of altercation that went on and then, she shows him all the bullets. So, he's trying to decide is this a

14

one-time thing? Is it agg assault? There's a million things they could charge, deadly conduct. They could have charged a million things.

My point of view is it's a totality of the circumstances, but when you ask someone what was the basis of your decision, they get to tell you everything they thought of, and they are not limited. That question is open-ended and every single thing he knows. To me, he could say, Yeah, I had already been out to this house and she looked like she had a black eye and I was really concerned and she was crying and I was worried then. To me, he could have gone on and on and on. To his credit, he did not. So, here we are in front of the jury, but I'm not going to limit him.

[Defense counsel]: We are not talking about what he thought or what he said he observed. We are talking about what he says my client said. I think this is more than a technicality. I think this implicates a fundamental right for him to be free from making coercive statements. This was not a typical investigation where you show up for the first time --

THE COURT: Sir, I totally disagree. That question saying, What specifically gave you the evidence that made the decision, you are asking him his decision-making. You are asking him for his opinion on why he did what he did at the scene.

[Defense counsel]: For continuous.

THE COURT: So, if you don't want the answer, don't ask the question. Bring the jury in.

[Defense counsel]: Your Honor, I would, again, reurge my objection --

THE COURT: It's overruled.

[Defense counsel]: -- and I would move for a mistrial at this time.

THE COURT: Overruled. That's denied.

In total, the State called eight witnesses at trial, including: Brandy, Hartman's

wife and the complaining witness who testified about the abuse and gave details

15

regarding the events described in the indictment; Crandall, Brandy's father who described what he observed and why he called the Sheriff to go out to check on Brandy on the 21st and then why he called them again on the 27th; two deputies with the Montgomery County Sheriff's Office, including Steven Hollingsworth and Pedro Herrera, who testified about the investigation and the evidence they collected; Duane, one of Brandy's and Shane's coworkers; Kayla, a long-time friend of Shane's; and other witnesses affiliated with law enforcement. The defense called Crandall and Deputy Hollingsworth back to testify as adverse witnesses during its case-in-chief. We include additional references to the trial testimony from the witnesses later in this memorandum opinion only as necessary for further analysis on the issue presented on appeal.

The jury found Hartman guilty of aggravated assault with a deadly weapon and continuous violence against the family as alleged in the indictments. After a hearing on punishment, the jury assessed punishment at twenty years of confinement for aggravated assault with a deadly weapon and ten years of confinement for continuous violence against the family. Hartman timely filed notices of appeal.

Issue

Appellant argues that the trial court erred by denying his motion to suppress statements he made to law enforcement that he alleges were the result of a custodial interrogation during which Appellant was not advised of his *Miranda* rights.

According to Appellant, when he was questioned in his home by Deputy Hollingsworth, the Deputy had his pistol drawn, he instructed Appellant to come out with his hands up, and the Deputy conducted a *Terry* search of Appellant. Appellant argues that, under these circumstances, Appellant's "freedom of movement was without question restrained to the degree associated with a formal arrest." Appellant further argues that his own statements to the Deputy "clearly indicate he did not believe he was free to leave[]" because he asked the Deputy if he could go and get his jacket, boots, and identification. According to Appellant, the interaction between the Deputy and Appellant constituted "custody" because (1) Appellant was physically deprived of his freedom of action in a significant way and (2) law enforcement created a situation that would lead a reasonable person to believe their freedom of movement was significantly restricted.

Standard of Review

We review a trial court's ruling on a motion to suppress under a bifurcated standard of review. *State v. Torres*, 666 S.W.3d 735, 740 (Tex. Crim. App. 2023); *Lopez v. State*, 610 S.W.3d 487, 494 (Tex. Crim. App. 2020). In conducting our review, "[w]e afford almost total deference to the trial court's findings of historical facts that are reasonably supported by the record and to its resolution of mixed questions that turn on credibility or demeanor[.]" *Lopez*, 610 S.W.3d at 494. "We review de novo a trial court's legal conclusions and its resolution of mixed questions

17

that do not turn on credibility or demeanor." *Id.* As the judge of the credibility of the witnesses in a hearing on a motion to suppress, the trial court has the discretion to accept or reject a witness's testimony. *State v. Ross*, 32 S.W.3d 853, 855 (Tex. Crim. App. 2000).

We reverse the trial court's ruling on a motion to suppress only if it is outside the zone of reasonable disagreement. *Wexler v. State*, 625 S.W.3d 162, 167 (Tex. Crim. App. 2021) (citing *State v. Cortez*, 543 S.W.3d 198, 203 (Tex. Crim. App. 2018); *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014)). When a trial court denies a motion to suppress and does not make findings of fact, we view the evidence in the light most favorable to the ruling, and we assume that the trial court made implicit findings of fact that support its ruling provided those findings are supported by the record. *Id.* (citing *Herrera v. State*, 241 S.W.3d 520, 527 (Tex. Crim. App. 2007)).

The erroneous denial of a motion to suppress a statement taken in violation of *Miranda* is constitutional error subject to review under Rule 44.2(a)'s standard. Tex. R. App. P. 44.2(a); *Jones v. State*, 119 S.W.3d 766, 777 (Tex. Crim. App. 2003). Under this standard, we consider the probable impact of the error on the jury in light of all the other evidence. *Neal v. State*, 256 S.W.3d 264, 284 (Tex. Crim. App. 2008). We will consider an error harmful, and the judgment must be reversed if, in light of

18

the other evidence, there is a reasonable likelihood that the error was actually a factor that contributed to the jury's verdict. *Id.*; *Jones*, 119 S.W.3d at 777.

Applicable Law

Custody is a mixed question of law and fact that does not turn on witness credibility and demeanor unless the witness testimony (if believed) would always decide the custody question. *Wexler*, 625 S.W.3d at 167 (citing *State v. Saenz*, 411 S.W.3d 488, 494 (Tex. Crim. App. 2013)); *Herrera*, 241 S.W.3d at 526-27. We apply a bifurcated standard of review, (1) giving almost total deference to the trial court's factual assessment of the circumstances surrounding the questioning and (2) reviewing the ultimate legal determination of whether the person was in custody under those circumstances under a de novo standard of review. *Wexler*, 625 S.W.3d at 167.

Statements made by an accused that are the result of custodial interrogation are not admissible unless law enforcement officers first warn the accused that he has the right to remain silent, his statement may be used against him, and he has the right to hire a lawyer or have a lawyer appointed. *Miranda v. Arizona*, 384 U.S. 436, 479 (1966); *see also* Tex. Code Crim. Proc. Ann. art. 38.22.

> A custody determination requires two inquiries: the circumstances surrounding the interrogation and whether a reasonable person in those circumstances would have felt that she was not free to leave. *Thompson v. Keohane*, 516 U.S. 99, 112 [] (1995). "Once the scene is set and the players' lines and actions are reconstructed, the court must apply an objective test" to determine whether there was restraint on freedom of

> movement of a degree associated with arrest. *Id*. The ultimate inquiry is whether, under the circumstances, a reasonable person would have believed that her freedom of movement was restricted to the degree associated with a formal arrest. *Stansbury v. California*, 511 U.S. 318, 322 [] (1994); *Dowthitt* [*v. State*], 931 S.W.2d [244,] 254 [(Tex. Crim. App. 1996)]. The "reasonable person" standard presupposes an innocent person. *Dowthitt*, 931 S.W.2d at 254 (citing *Florida v. Bostick*, 501 U.S. 429, 438 [] (1991)).

*Wexler*, 625 S.W.3d at 167. The Court of Criminal Appeals has generally outlined four situations that may constitute custody: (1) the suspect is physically deprived of his freedom of action in any significant way, (2) a law enforcement officer tells the suspect that he cannot leave, (3) law enforcement officers create a situation that would lead a reasonable person to believe his freedom of movement has been significantly restricted, or (4) there is probable cause to arrest, and law enforcement officers do not tell the suspect that he is free to leave. *Id.* at 167-68 (citing *Dowthitt*, 931 S.W.2d at 255). For the first of the three categories to constitute *Miranda* custodial interrogation, it requires more than just a significant restriction, it requires a restriction on the detainee's freedom "to the degree associated with an arrest[,]" as opposed to an investigative detention. *Id.* at 168. The defendant bears the initial burden to establish that his statement was the product of a custodial interrogation. *Id*. (citations omitted). Hartman alleges that the officers created a situation that would lead a reasonable person to believe his "freedom of movement was without question restrained to the degree associated with a formal arrest."

20

An officer may temporarily detain a person to investigate, to maintain the status quo, or for officer safety. *Rhodes v. State*, 945 S.W.2d 115, 117 (Tex. Crim. App. 1997) (citations omitted). Persons temporarily detained for purposes of an investigation are not "in custody" for *Miranda* purposes, and the right to *Miranda* warnings is not triggered during an investigative detention. *Hauer v. State*, 466 S.W.3d 886, 893 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (citing *Berkemer v. McCarty*, 468 U.S. 420, 439-40 (1984); *State v. Stevenson*, 958 S.W.2d 824, 829 (Tex. Crim. App. 1997)); *see also Dowthitt*, 931 S.W.2d at 255. Whether seizure of a person is an investigative detention or an arrest should be determined on a case-by-case basis, considering all of the objective circumstances surrounding the seizure. *State v. Ortiz*, 382 S.W.3d 367, 376-77 (Tex. Crim. App. 2012) (citing *Dowthitt*, 931 S.W.2d at 255). Handcuffing alone does not necessarily convert an investigative detention into an arrest. *See State v. Sheppard*, 271 S.W.3d 281, 283 (Tex. Crim. App. 2008).

### Analysis

Appellant's brief concedes that defense counsel "potentially opened the door" to admission of testimony about the statements Appellant made to the officers. In fact, the record shows that the defense attorney is the one who asked Deputy Hollingsworth on cross-examination an open-ended and broad question and when

21

Hollingsworth attempted to answer the question the defense attorney cut off his answer as follows:

> Q. What specifically on that day - - talking about the October 27th, morning of the 28th, what specifically gave you the evidence that you made the decision that continuous family violence should be charged?

> A. Shane Hartman told me he actually assaulted - -

The Court of Criminal Appeals has explained that the law of "invited error" estops a party from complaining of an error that the party itself induced. *Prystash v. State*, 3 S.W.3d 522, 531 (Tex. Crim. App. 1999); *Costilow v. State*, 318 S.W.3d 534, 540 (Tex. App.—Beaumont 2010, no pet.). Here, the defense is responsible for the fact that the jury heard Hollingsworth testify that Shane told Hollingsworth he "actually assaulted" Brandy, and because the defense invited that testimony, he is not entitled to a reversal based on this testimony because the defense elicited the response from Hollingsworth. *See Gore v. State*, 605 S.W.3d 204, 211 (Tex. App.—Beaumont 2020, no pet.) (concluding the "invited error" doctrine prevented appellant from complaining on appeal about testimony the defense elicited at trial); *Williams v. State*, No. 09-12-00350-CR, 2014 Tex. App. LEXIS 3020, at **11-12 (Tex. App.—Beaumont Mar. 19, 2014, pet. ref'd) (mem. op., not designated for publication) ("[W]e conclude [appellant] cannot complain on appeal of testimony she elicited at trial.").

The trial court denied Hartman's motion to suppress the statements he made to the officers and explained that it did not appear that Hartman was in custody nor "under duress[]" when he made the statements to the officers. Additionally, the trial court noted that the State did not violate the motion in limine, and it was the defense attorney who had "opened the door" by asking the question and the witness should be allowed to answer the question. Later, the defense in its case-in-chief recalled Hollingsworth to the stand to further examine Hollingsworth. After the defense passed the witness, the State sought to introduce a redacted copy of Hollingsworth's body camera video which the trial court denied, but the trial court allowed the State to question Hollingsworth as follows:

> Q. (BY [Prosecutor]): And Deputy Hollingsworth, on cross-examination, the Defense attorney asked you what information in your investigation led you to probable cause. You first said, He told me that he assaulted her. Then, you were stopped and couldn't continue the additional evidence that you had found, but we want to hear when you said that comment, He told me that he assaulted her, how did he assault her?
>
> A. He stated to me, Yes, I hit her.
>
> Q. Did he tell you a time frame when this happened?
>
> A. He stated nothing had happened in the last ten days from the 27th.
>
> Q. Did he tell you that besides hitting her he used any other part of his body to assault her?
>
> A. He also stated that he kicked her and elbowed her and pushed her around quite a bit.
> . . .

23

Q. Now, you were able to speak with [Brandy] about what happened, correct?

A. Yes.

Q. And is what he is telling you consistent with what [Brandy] said happened?

A. Yes.

The defense attorney then asked Hollingsworth:

Q. (BY [Defense counsel]) Did Mr. Hartman tell you that he went to his truck to grab a firearm?

A. No.

Q. Did he say that he shot at Mrs. Hartman?

A. No.

Q. Did he say that he fired any shots at all that night?

A. No.

Q. At -- did he say specifically what it is he did?

A. Yes.

Q. When he came back in, that he did some stuff?

A. Yes.

Q. Did he say that he pushed her, also?

A. Yes.

Q. And did he say that she pushed him?

A. Yes.

24

Q. There was pushing back and forth. Did he say that?

A. Yes.

Q. And was there anything else that he said?

A. No. I think it's all been said.

Q. Did he say why he was so upset that night?

A. Yes.
. . .
Q. (BY [Defense counsel]) Did Mr. Hartman ever tell you -- did he tell you he was upset that night about an affair?

A. Yes.

Q. And that's what prompted their argument?

A. Yes.

In Appellant's brief, Hartman argues that he was in custody when he made the inculpatory statements to Hollingsworth because Hartman did not believe he was free to leave, as reflected by Hartman asking Hollingsworth if he could retrieve his jacket, boots, and identification. Appellant argues that a reasonable person would believe that his movement was restrained to the degree associated with arrest if he was "held at gunpoint by a law enforcement officer[]" and then "questioned up against the very wall he was searched on[.]"

Hartman argues in his brief that he was "held at gunpoint" while Hollingsworth questioned him, but the record from the pre-trial hearing does not support this allegation. Deputy Hollingsworth testified that before responding to the

25

911 call to the Hartman home on October 27, 2022, Hollingsworth had responded to another call to the home concerning Brandy's wellbeing about a week before. He also testified that dispatch had advised him there were guns in the Hartman home. Deputy Hollingsworth and Deputy Hererra testified that, when the officers approached the house on the night of October 27, they could hear arguing inside. Hollingsworth testified that he drew his pistol upon entering the home, but that he kept it low and not pointed at anyone, and once Hartman stepped out of a back room, Hollingsworth holstered his weapon. The body camera video which was played for the trial court during the pretrial hearing also shows that Hollingsworth drew his pistol after Brandy let Hollingsworth into the home, and when Hartman entered the room, the Deputy lowered his pistol, holstered the weapon, and then patted Hartman down. The body camera video shows that, after the pat-down, Hollingsworth told Hartman, "You can turn around and talk to me." The body camera video also shows that Hartman talked to Deputy Hollingsworth for about ten minutes. Although Appellant alleges that he was questioned while "up against the very wall he was searched on," the body camera video also does not support this assertion. According to the video, it appears that both Hartman and Hollingsworth were standing in the living room while they talked, and Hartman was not handcuffed during that conversation, nor was he questioned "at gun point."

26

As to Appellant's argument that Hartman did not feel free to leave as demonstrated by the fact he asked the Deputy for permission to retrieve personal items, the record reflects that Hartman was in his own home, he voluntarily made statements to the officer, he never expressed a desire to leave, and he was not told that he could not leave until after he made his statements to Hollingsworth. *See Oregon v. Mathiason*, 429 U.S. 492, 495 (1977) ("Any interview of one suspected of a crime by a police officer will have coercive aspects to it . . . [b]ut police officers are not required to administer Miranda warnings to everyone whom they question."). After watching the officer's body camera video, the trial court concluded that Hartman "did not appear to be under duress[,]" and we defer to the trial court's findings that turn on credibility or demeanor. *See Lopez*, 610 S.W.3d at 494. Viewing the record in the light most favorable to the trial court's ruling, we conclude that the trial court could have reasonably believed that Hartman opened the door to the evidence when he asked his question of Hollingsworth at trial, and that Hartman failed to meet his burden to prove that his statements to Hollingsworth on October 27th about assaulting Brandy were custodial. *See Wexler*, 625 S.W.3d at 167; *State v. Garcia-Cantu*, 253 S.W.3d 236, 241 (Tex. Crim. App. 2008). We also cannot say the trial court erred in its decision to allow Hollingsworth to answer the defense attorney's questions.

That said, even assuming without deciding that the trial court erred, we will not reverse the conviction unless the record reflects that Appellant's substantial rights were affected. *See* Tex. R. App. P. 44.2(a); *Jones*, 119 S.W.3d at 777; *Neal*, 256 S.W.3d at 284. Appellant makes only a conclusory assertion in his appellate brief that he was prejudiced by the trial court's ruling denying his motion to suppress. A conclusory assertion without argument and citations to authority is insufficient to support reversal. *See* Tex. R. App. P. 38.1(i); *Jackson v. State*, 745 S.W.2d 4, 17 (Tex. Crim. App. 1988) (en banc) (a conclusory assertion of harm is insufficient to establish reversible error); *Hanks v. State*, No. 09-23-00132-CR, 2024 Tex. App. LEXIS 6748, at *38 (Tex. App.—Beaumont Sept. 11, 2024, pet. ref'd) (mem. op., not designated for publication) (same).

Here, the record from the trial shows that Brandy's father testified about his reason for concern and why he called the Sheriff on the 21st and again on the 27th. Brandy testified about the abuse and explained that in May of 2022, Hartman had pinned her between the bed and dresser, he headbutted her, and she received an injury to her forehead. She also testified that on October 14, 2022, she and Hartman had an argument, during which Hartman pinned her in the corner, fired two shots near her and other shots through the open back door, and one of the shots grazed her head. Brandy testified that Hartman also struck her in the face with his pistol. Deputy Hollingsworth testified that, when he went to the home on October 21, 2022, he

28

observed injuries on Brandy, including bruising on her face, arms, legs, and foot, and she also had black eyes. Deputy Hererra testified that on October 27th, he could see a "visible injury under [Brandy's] left eye[.]" The officers took photographs of Brandy's injuries, which showed visible bruising to her eye, face, arms, legs, and foot, and the photographs were admitted into evidence and shown to the jury.

After examining the record as a whole, we have fair assurance that the error, if any, did not materially influence the jury's verdict. *See Neal*, 256 S.W.3d at 284; *Jones*, 119 S.W.3d at 777. Therefore, we conclude that Appellant has not demonstrated that his substantial rights were affected. *See* Tex. R. App. P. 44.2(a). We overrule Appellant's issue.

Having overruled Appellant's issue, we affirm the trial court's judgments of conviction.

AFFIRMED.

LEANNE JOHNSON
Justice

Submitted on September 11, 2025
Opinion Delivered September 17, 2025
Do Not Publish

Before Golemon, C.J., Johnson and Wright, JJ.